1  Ogonna Brown, Esq.
   Nevada Bar No. 7589
2  OBrown@lrrc.com
   Adrienne Brantley-Lomeli, Esq.
3  Nevada Bar No. 14486
   ABrantley@lrrc.com
4  LEWIS ROCA ROTHGERBER CHRISTIE LLP
   3993 Howard Hughes Parkway, Suite 600
5  Las Vegas, NV  89169
   Tel:    702.949.8200
6  Fax:    702.949.8398
7
8  *Attorneys for Creditors MDF Holdings, LLC,*
   *Tara Lipton, and Herbert Feinberg*

*E-Filed on April 6, 2020*

Lenard E. Schwartzer, Esq.
Nevada Bar No. 0399
Jeanette E. McPherson, Esq.
Nevada Bar No. 5423
SCHWARTZER & MCPHERSON
LAW FIRM
2850 South Jones Blvd., Suite 1
Las Vegas NV  89146

*Attorneys for Shelley D. Krohn, Chapter 7 Trustee*

9

10                **UNITED STATES BANKRUPTCY COURT**

11

12                       **DISTRICT OF NEVADA**

13  In re:                              Chapter 7

14  HUNTER LIPTON,                      Case No. BK-19-13898-ABL

15              Debtor.                 **JOINT MOTION TO APPROVE**
                                        **SETTLEMENT UNDER RULE 9019**
16

17
                                        Date Of Hearing: *OST PENDING*
18                                      Time Of Hearing: *OST PENDING*

19                                      Judge: Hon. August B. Landis

20       Creditors  MDF  Holdings,  LLC  ("MDF"),  Tara  Lipton  ("Ms. Lipton"),  and  Herbert

21  Feinberg ("Mr. Feinberg") (collectively, "Creditors"), by and through their counsel, Ogonna M.

22  Brown, Esq. of the law firm Lewis Roca Rothgerber Christie, LLP, and Shelley D. Krohn, the

23  appointed Chapter 7 trustee of the above-captioned bankruptcy estate ("Trustee"), by and through

24  her counsel, Lenard E. Schwartzer, Esq. of Schwartzer & McPherson Law Firm (collectively, the

25

26  00643376.1 AMSLLP

    110887722.1

*(sidebar, left margin)* 3993 Howard Hughes Parkway, Suite 600   Las Vegas, NV  89169

**Lewis Roca**
ROTHGERBER CHRISTIE

"Parties") hereby move this Court pursuant to Bankruptcy Rule 9019 for an order approving a settlement agreement by and between the Parties (the "Motion").

This Motion is made and based upon the following Memorandum of Points and Authorities, the Declaration of Shelley D. Krohn. ("Krohn Declaration"), the Court appointed Chapter 7 Trustee of the Bankruptcy Estate of Hunter Lipton ("Debtor"), filed separately and concurrently herewith pursuant to Rule 9014(c) of the Local Rule of Bankruptcy Practice of the United States District Court for the District of Nevada. A true and correct copy of the Settlement Agreement is attached to the Krohn Declaration as **Exhibit "1"** (the "Settlement Agreement"). This Motion is also supported by the following Memorandum of Points and Authorities, the pleadings and papers on file herein, and any argument this Court may entertain regarding the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES
### I.    BACKGROUND FACTS

1.    As set forth in greater detail in the recitals provided in the Settlement Agreement, Ms. Lipton and Debtor were married on January 19, 2003, in a civil ceremony in Palm Beach, Florida.

2.    There are four (4) minor children in the fourteen-year marriage, ranging in ages from 16 to 10.

**FORMATION OF MDF**

3.    MDF is a Delaware limited liability company, which commenced operations in 2011.

4.    The ownership structure of MDF and each member's units and voting/approval rights as of the Petition Date is reflected in the MDF Amended and Restated Operating Agreement dated September 23, 2013 (the "Operating Agreement").

5.    In accordance with the Operating Agreement, Feinberg is MDF's Manager.

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

00643376.1 AMSLLP
110887722.1

- 2 -

6.      In 2015, Gotham loaned $2,000,000 to MDF.    The balance currently due and owing to Gotham from MDF as of February 29, 2020, is approximately $1,635,631.

7.      In accordance with the Operating Agreement Recital B, Feinberg "may amend this Agreement without any vote, consent, approval, authorization or other action of any Member (provided that notice of such amendment is given to all Members) to (a) subject to Section 11.12(a), designate the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series; or (b) reflect (i) the withdrawal, addition or substitution of Members, and (ii) the issuance of additional Units."

8.      Recital C further provides that "Section 14.2 of the Operating Agreement permits Feinberg to amend the Operating Agreement without any without any vote, consent, approval, authorization or other action of any Member." In 2015, Mr. Lipton approached Mr. Feinberg for an additional loan for MDF to fund a portion of another asset acquisition for MDF.  Gotham ultimately loaned $2,000,000 to MDF out of the $3,000,000+ purchase price.

9.      The balance currently due and owing to Gotham from MDF is approximately $1,635,631.00 as of February 29, 2020.

10.      Feinberg is also the managing member of Gotham Enterprises, LLC ("Gotham") and controls Gotham.

11.      As of the Petition Date, (i) Feinberg, together with Gotham, are the title holder of 59.65% interest in MDF, and (ii) Debtor is the title holder of approximately 29.44% interest in MDF, consisting of 250,000 Class A-1 units of MDF, which are non-voting shares.  Debtor's Schedules filed in the Bankruptcy Action incorrectly reflect that the Debtor is the title holder of a 30.38% interest in MDF.

12.      Debtor was suspended from MDF on February 11, 2019, and was terminated from MDF on May 17, 2019, before his June 20, 2019 bankruptcy filing.

13.     On May 13, 2019, Debtor commenced a lawsuit against MDF and Mr. Feinberg in the Eighth Judicial District Court, Clark County, Nevada, pending as Case No. A-19-794699-C, in Department No. 20 (hereinafter the "State Court Action").

**DEBTOR'S INTEREST IN MARITAL ASSETS**

14.     Debtor, Ms. Lipton and the children resided at the residence located at 255 East 74th Street, Apartment 3A, New York, New York (the "New York Apartment") since 2009.  Title to the 74th Street Apartment is held in the joint names of Debtor and Ms. Lipton.

15.     In April 2018, Debtor moved out of the 74th Street Apartment.

16.     Debtor and Ms. Lipton purchased a time share located at 315 East Dean Street (St. Regis Residence Club), Aspen Colorado 81611 during their marriage, title to which is not held in the Debtor's name (the "Aspen Timeshare").

17.     On or around July 23, 2018, Ms. Lipton commenced divorce proceedings against Defendant by filing a Summons (and Notice of Automatic Orders pursuant to D.R.L. § 236 and Notice Concerning Continuation of Health Care Coverage and Notice of Guideline Maintenance) and Verified Complaint, in the Supreme Court of the State of New York, County of New York, assigned Index No. 307119/2018 ("New York Divorce Action").

18.     When Ms. Lipton commenced the New York Divorce Action, there was no judgment in any court for a divorce, and no other matrimonial action for divorce between Ms. Lipton and Debtor was pending in the New York or any other court of competent jurisdiction.

19.     As of the execution of this Settlement Agreement, there is no order for pre-petition alimony or child support and no judgement for divorce from the New York Court arising from the New York Divorce Action, and the New York Court has not made an adjudication of the division of assets or a distribution of assets relating to the Debtor, Ms. Lipton and his four (4) children.

**CANTAL TRADE LITIGATION**

20.    In 2017, Lokesh Melwani and Cantal Trade, Ltd. (collectively, "Cantal Trade") commenced litigation against Mr. Lipton, Eagle Point Financial, LLC and MDF, which case is currently pending in the United States District Court, Southern District of New York as Case No. 1:17-cv-08308-PGG/RJS ("Cantal Trade Litigation").

21.    Cantal Trade asserts claims of unjust enrichment and conversion against MDF on the basis that MDF was allegedly "created or founded by Hunter Lipton, using in part or in whole assets which are the rightful property" of Cantal Trade.

22.    As a result of the commencement of Mr. Lipton's Bankruptcy Case, the automatic stay is in place and the Cantal Trade Action is stayed solely as to Mr. Lipton.

23.    On September 11, 2019, New York District Court Judge Paul G. Gardephe, presiding over the Cantal Trade Action, ordered that Eagle Point and MDF proceed to defend the litigation Cantal Trade commenced against them pursuant to the Order (ECF No. 85).

24.    MDF has been forced to expend attorneys' fees to defend the frivolous litigation commenced by Cantal Trade, and is now exposed to potential liability for nearly $600,000.

**DEBTOR'S CHAPTER 7 BANKRUPTCY**

25.    On June 20, 2019 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby commencing bankruptcy Case No. BK-S-19-13898-ABL (the "Bankruptcy Case").

26.    Shelley D. Krohn is the duly appointed and acting Chapter 7 Trustee in the Debtor's Bankruptcy Case.

27.    As of the Petition Date, the amount of the IRS claim against Debtor and Ms. Lipton is $3,649,784.96, of which $48,901.28 is purported to be secured by the IRS, and $1,037,996.51 is claimed as taxes or penalties under Section 507(a)(8). *See* POC No 8.

28.    In the month leading up to the Petition Date, Debtor did not provide any financial support to Ms. Lipton and their four (4) minor children, as evidenced in the Proof of Claim Ms.

Lipton filed in Debtor's Bankruptcy Case, which includes a claim for $69,215.00 relating to the outstanding domestic support obligation ("DSO") due and owing for June 2019. *See* POC No. 3.

29.     On July 22, 2019, the Trustee and Ms. Lipton entered into a Stipulation agreeing that the Bankruptcy Case did not stay the New York proceedings pending pre-petition, regarding the establishment of domestic support obligations, child custody and visitation matters, the dissolution of the marriage.  *See* Stipulation (ECF No. 24).

30.     On August 13, 2019, Mr. Feinberg filed a Proof of Claim against the Debtor in the amount of $6,912,489.20, consisting of $761,613.01 in unpaid interest due and owing on a 2011 loan to Debtor, Mr. Feinberg's guaranty on the Deutsche Bank loan for the New York Apartment in the amount of $5,000,000, and a $1,150,876.19 loan reflected in a Promissory Note incurred by the Debtor. *See* POC No. 1.

31.     On August 13, 2019, MDF filed a Proof of Claim against the Debtor in the amount of $1,974,495.65, consisting of a $500,833.33 Promissory Note the Debtor wrote for his benefit, misappropriation of funds for Debtor's personal use in the amount of $184,492, $34,399.32 loss to MDF for the under market interest rate Debtor loaned to himself from MDF and negative capital for double dipping against MDF from 2013 through 2017. *See* POC No. 2.

32.     On September 23, 2019, MDF and Mr. Feinberg commenced an Adversary Proceeding Against Debtor for, among other things, fraud and misappropriation of company funds, pending as Adv. Case No. 19-01095-ABL ("MDF Adversary Action").

**BANKRUPTCY ADVERSARY PROCEEDINGS**

33.     On September 23, 2019, Ms. Lipton commenced an Adversary Proceeding Against Debtor for, among other things, a ruling to Determine Assets of the Estate Pursuant to 11 U.S.C. § 541 for the division of marital assets of the Debtor and Ms. Lipton and to determine the extent and scope of the nondischargeable debts of the Debtor under 11 U.S.C. § 523, pending as Adv. Case No. 19-01096-ABL ("Lipton Adversary Action").

00643376.1 AMSLLP
110887722.1

34.     On October 23, 2019, the Trustee filed a Motion to Intervene as Defendant and Counter-Claimant in the Lipton Adversary Complaint (Adv. ECF No. 29).

35.     On October 30, 2019, Ms. Lipton stipulated to allow the Trustee to intervene as a real party in interest regarding the division of marital assets relating to assets of the Bankruptcy Estate as of the Petition Date, as set forth in the Stipulation to Grant Motion to Intervene as Defendant and Counter-Claimant and Vacate Hearing (Adv. ECF No. 34).

36.     On November 1, 2019, the Trustee filed an Answer and Counterclaim (Adv. ECF No. 36).

37.     On December 2, 2019, Ms. Lipton filed an Answer to Counterclaim in response to the Trustee's Counterclaim (Adv. ECF No. 38).

38.     On December 10, 2019, the Trustee filed a Motion for Partial Summary Judgment for Partial Judgment on the Pleadings ("Motion for Summary Judgment"). (Adv. ECF No. 39).

39.     On February 25, 2020, Ms. Lipton filed an Opposition to the Motion for Summary Judgment (Adv. ECF No. 56).

40.     On March 3, 2020, the Trustee filed a Reply in Support of the Motion for Partial Summary Judgment for Partial Judgment on the Pleadings (Adv. ECF No. 59).

41.     On March 10, 2020, the Bankruptcy Court held a hearing on the Trustee's Motion for Partial Summary Judgment for Partial Judgment on the Pleadings (Adv. ECF No. 39).

42.     The Court took the Motion for Summary Judgment under submission, and scheduled a hearing for April 9, 2020, at 3:00 p.m. for the sole purpose of issuing a ruling in open court.

**CHAPTER 7 TRUSTEE'S DUE DILIGENCE RE VALUE OF ESTATE'S INTEREST IN MDF**

43.     As set forth in greater detail in the Krohn Declaration, the Trustee has conducted due diligence in connection with the Estate's minority non-voting interest in MDF.

44.     On August 15, 2019, the Trustee received over fifty (50) pages of information regarding MDF, including, but not limited to, financial information regarding MDF, MDF's

revenue and inbound from 2016, 2017, 2018, and the projections through 2019, along with the operating governing documents, such as the MDF Operating Agreement and amendments thereto, and information regarding the limitations on the MDF Stock Transfer.

45.    In addition to the MDF documents provided on August 15, 2019, on November 1, 2019, MDF provided the Trustee with nearly 300 pages of financial documents relating to MDF, including, but not limited to years' worth of the following financial documents:

(a) Balance Sheets;

(b) Profit and Loss Statements;

(c) Tax Returns;

(d) K-1s;

(e) Depreciation and amortization reports;

(f) Itemization of tax expenses and deductions;

(g) Review report of independent certified public accountants;

(h) Cash flow statements; (i) Income statements;

(j) Statements of members' equity;

(k) Consolidated financial statement;

(l) Pre-petition offers to purchase membership interests; and

(m) Valuation of MDF's intangible assets.

46.    On January 2, 2020, as part of its initial disclosures in connection with the Adversary Complaint, MDF disclosed to the Trustee nearly 900 pages of documents to the Trustee, which included additional information relating to MDF.

47.    On February 4, 2020, MDF submitted to the Trustee the draft Balance Sheets and Profit and Loss Statements of MDF for the year 2019.

48.    On March 19, 2020, MDF submitted to the Trustee comparison results for MDF comparing the year 2019 and through February 2020.

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

00643376.1 AMSLLP
110887722.1

1    <u>**TRUSTEE'S DUE DILIGENCE RE VALUE OF ESTATE'S INTEREST IN NEW YORK APARTMENT**</u>

2        49.    On January 21, 2020, Ms. Lipton submitted to the Trustee an appraisal report for

3    the New York Apartment. The report estimated the value of the New York Apartment as

4    $5,000,000.

5        50.    On March 17, 2020, the Trustee submitted to Ms. Lipton an independent valuation

6    from a realtor of the New York Apartment procured by the Trustee. The realtor estimated the

7    value of the New York Apartment in the $5,900,000 to $6,150,000 range.

8        51.    Neither valuation considered the costs of sale which in New York range are

9    approximately 8 to 10 percent.[1]

10        52.    The New York Apartment is subject to a mortgage in the approximate amount of

11    $5,000,000 which is guaranteed by Herb Feinberg.

12    <u>**SETTLEMENT IS IN THE BEST INTEREST OF ESTATE**</u>

13        53.    The proposed global Settlement Agreement entered into between the Trustee, on

14    one hand, and MDF, Herb Feinberg and Ms. Lipton, on the other hand, will eliminate substantial

15    administrative fees and costs and resolve the contested matters between the Parties.

16        54.    The proposed settlement will eliminate the need to retain expert witnesses and the

17    administrative cost and delay attendant with holding evidentiary hearings regarding the valuation

18    of MDF on one hand, and the valuation of the New York Apartment on the other hand, which

19    _____

20    [1] Seller closing costs in NYC are between 8% to 10% of the sale price. Seller closing costs are usually higher for co-ops than condos because most co-ops charge sellers a flip tax. Closing

21    costs include a 6% broker fee, NYC Transfer Taxes of 1.4% to 1.825%, legal fees, a flip tax for co-ops, building fees and miscellaneous fees. The Mansion Tax for New York City is estimated

22    at 2.25% for the subject property.

23    The traditional 6% real estate broker commission is the largest component of seller closing costs in New York City. The second largest closing costs are the New York City and New York State

24    Transfer Taxes which are a combined 1.4% for sales at or below $500,000 and 1.825% for anything above $500,000. In addition, the sale costs will include title company fees and costs

25    and attorneys' fees and costs.

26

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

will globally resolve all of the issues between the Trustee, MDF, Feinberg and Ms. Lipton in connection with the pending Adversary Complaint in the matter of *Hunter Lipton v. Tara Lipton*, Adv. Case No. 19-01096-ABL, and the State Court Action.

55.     The Trustee is bound by limitations on transferability of the Estate's MDF's shares set forth under Section 12.1 of the MDF Operating Agreement, impacting the Trustee's ability to market and sell the Bankruptcy Estate's minority non-voting shares in MDF. Section 12.1 of the MDF Operating Agreement, governing transfer restrictions of any membership interests in MDF, provides the following limitations that bind the Trustee:

> 12.1    Transfer Restrictions. Except for Feinberg, no Member may transfer any of their Interest to any Person who is not a Member other than in compliance with the terms and conditions of Article 12. Notwithstanding the aforesaid, no Member may transfer any of their Interest without the consent of Feinberg…Any attempted transfer of any Interest that is made other than in compliance with the terms and conditions of this Article 12 shall be invalid and shall not be reflected on the Company's books.

*See* MDF Operating Agreement, § 12.1, p. 17.

**SETTLEMENT CONFERENCE AND IMPACT OF CORONAVIRUS ON VALUE OF ESTATE ASSETS**

56.     On March 23, 2020, an informal settlement conference was held via video and telephonic appearance with the Trustee, her counsel, Mr. Feinberg, Ms. Lipton, representatives of MDF, and respective counsel for the participants ("Settlement Conference").

57.     Extensive discussions and negotiations were held during the Settlement Conference, which commenced at 11:00 a.m. and concluded at 4:54 p.m., with breaks during the settlement discussions.

58.     The Trustee believes that the proposed settlement results in a quick, fair, and reasonable recovery for the creditors of the Estate, factoring in the overall recovery, the relative costs associated with litigating outside of this proposed settlement and the costly appeals of any ruling from this Court.

59.     In the Trustee's business judgment, the Trustee: (i) asserts that she has made an informed decision in entering into the Settlement Agreement; (ii) believes that the settlement

between the parties (as evidenced by the Settlement Agreement) is fair, equitable, and reasonable; and (iii) believes that approval of the Settlement Agreement is in the best interests of the Bankruptcy Estate and its creditors.

**SETTLEMENT WITH CHAPTER 7 TRUSTEE AND CREDITORS**

60.    On April __, 2020, the Trustee and the Creditors executed the proposed Settlement Agreement, attached as **Exhibit "1"** to the Krohn Declaration, with the acknowledgement that the Settlement Agreement, and all obligations and releases contained therein, are contingent upon Bankruptcy Court approval under Bankruptcy Rule 9019.

## II.    TERMS OF THE SETTLEMENT

1.    The terms of the settlement between the parties have been memorialized in a written Settlement Agreement which is attached as **Exhibit "1"** to the Krohn Decl.

2.    The Settlement Agreement is contingent upon Bankruptcy Court approval. *See* Settlement Agreement at ¶2.

3.    A summary of the material terms of the Settlement Agreement agreed to by the parties thereto are as follows:

- ***Payment***. MDF, Feinberg and Ms. Lipton shall pay to the Debtor's Bankruptcy Estate the amount of Seven Hundred Thousand Dollars ($700,000.00).

- ***Transfer of Estate's Interest in MDF***. The Trustee shall execute an Assignment and Bill of Sale to transfer to Feinberg or his assigns to be designated by Feinberg 100% of the Estate's right, title and interest in MDF, including, but not limited to, all of the Estate's interest in the form of 250,000 Class A-1 non-voting units of MDF in their entirety and any unissued shares in MDF, including any and all rights and obligations arising thereunder, including, but not limited to, any pre- or post-petition rights to an accounting, income distributions, net profits, capital contributions, capital accounts, elections, management, or compensation, as governed under the Operating Agreement, and any amendments thereto, by way of

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

a Bill of Sale and Assignment in the forms attached to the Agreement as Exhibit "B", to be held in trust by Trustee's counsel subject to Bankruptcy Court approval. Mr. Feinberg hereby consents to the transfer of the Estate's interest in MDF to Mr. Feinberg pursuant to Section 12.1 of the Operating Agreement.

- ***Transfer of Deed in Favor of Ms. Lipton***. Trustee shall execute a Grant, Bargain and Sale Deed transferring all of the Estate's right, title and interest in the 74th Street Apartment to Ms. Lipton in the form attached to the Agreement as Exhibit "C" , to be held in trust by Trustee's counsel subject to Bankruptcy Court approval. The effect of this deed shall include any right of survivorship held by the Estate.

- ***Transfer of Title in Personal Property in Favor of Ms. Lipton.*** The Trustee shall execute a bill of sale of the Estate's right, title and interest in any and all of the personal property and contents, including but not limited to, furniture, furnishings, artwork, and personalty, reposed in the 74th Street Apartment (the "74<u>th</u> Street Contents")  and the Aspen Timeshare by way of a Bill of Sale in the form attached to the Agreement as Exhibit "D", to be held in trust by Trustee's counsel subject to Bankruptcy Court approval.

- ***Dismissal of State Court Litigation***. The Trustee shall execute the Stipulation and Order to Dismiss the State Court Action, with prejudice, in the form attached to the Agreement as Exhibit "E", to be held in trust by Trustee's counsel subject to Bankruptcy Court approval.

- ***No Objection to Priority DSO Claim of Ms. Lipton Up to $35,000***. The Trustee agrees that she will not object to Ms. Lipton's Domestic Support Obligation ("<u>DSO</u>") claim as long as the DSO claim does not exceed $35,000.00, which claim will be afforded priority under 11 U.S.C. § 523(a). The Trustee reserves the right to object to Ms. Lipton's priority claim in the event the priority portion of Ms.

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

1    Lipton's pre-petition claim for DSO, currently in the amount of $69,215.00 is not

2    reduced to $35,000.

3    • ***No Amendment of MDF and Feinberg Claims as Priority***. Neither MDF nor Mr.

4    Feinberg will amend their respective claims to assert a priority for Proof of Claim

5    No. 1 and Proof of Claim No. 2.

6    • ***Division of Marital Assets***. Subject to the Bankruptcy Court's approval of this

7    Agreement, the Trustee shall not object to Ms. Lipton's amendment of her Proof of

8    Claim No. 3 to reflect the division of the marital assets between the Debtor and Ms.

9    Lipton as follows: Ms. Lipton may amend her proof of claim to attribute 50% of

10   the value of the Estate's interest in MDF in the amount of $550,000.

11   • ***Transfer Tax for Estate's Transfer of New York Apartment***.  The Trustee shall

12   not be responsible for the payment of any conveyancing costs, transfer taxes, and

13   recording fees imposed on the transfer or recording of title of the 74th Street

14   Apartment to Ms. Lipton's sole name.

15   • ***Waiver and Release of Claims by Bankruptcy Estate***.  The Bankruptcy Estate

16   waives any and all potential claims that may be held by the Bankruptcy Estate

17   against the Creditors.

18   *See* Settlement Agreement, **Exhibit "1"** to the Krohn Decl.

19   4.    The foregoing is a summary of certain of the material terms of the settlement and

20   is qualified in its entirety by the Settlement Agreement itself, which contains many terms. *See*

21   Settlement Agreement, **Exhibit "1"** to the Krohn Decl.

22   **III.    LEGAL ARGUMENT**

23   Pursuant to Bankruptcy Rule 9019, the Court may approve a proposed settlement of a

24   claim, after notice and a hearing. Fed. R. Bankr. P. 9019(a). The Bankruptcy Court is afforded

25   great latitude in approving settlement agreements.  However, the Court's discretion is not

26   unlimited; compromises must also be fair and equitable. *Woodson v. Fireman's Fund Ins. Co. (In*

1  *re Woodson)*, 839 F.2d 610, 620 (9ᵗʰ Cir. 1988). Such agreements must also be reasonable under

2  the particular circumstances of the case, and in the estate's best interests. *In re Mickey Thompson*

3  *Entertainment Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003).

4        In reviewing proposed settlements, "courts need not rule upon disputed facts and questions

5  of law, but rather only canvass the issues. A mini trial on the merits is not required." *Burton v.*

6  *Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997); *see also In re Hyloft Inc.*, 451

7  B.R. 104, 109 (Bankr. D. Nev. 2011).  In deciding whether to approve a proposed settlement, the

8  bankruptcy court must make an informed decision; the court must independently make a finding

9  that the compromise is reasonable, fair and equitable. *See In re Hyloft*, 451 B.R. at 109.

10      5.    In determining whether a proposed settlement is fair and reasonable, the Court

11 should consider the following four *A&C* factors:

12         a.  The probability of success in the litigation;

13         b.  the difficulties, if any, to be encountered in the matter of collection;

14         c.  the complexity of the litigation involved, and the expense, inconvenience and delay

15            necessarily attending it; and

16         d.  the paramount interest of the creditors and a proper deference to their reasonable

17            views in the premises.

18 *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9ᵗʰ Cir. 1986); *Woodson* at 620;

19 *Mickey Thompson* at 420.

20      In the present case, overall, the *A&C* factors favor approval of the proposed settlement.

21 Each factor is analyzed below.

22 **A.    Probability of Success in the Litigation**

23      The "litigation" that would be pursued by the Trustee are (a) to address the valuations of

24 the Estate's interest in MDF and the Estate's interest in the equity, if any, in the New York

25 Apartment or (b) the Trustee's right to sell both the Debtor's and Ms. Lipton's interest in the New

26 York Apartment or (c) the Trustee's right to sell the Debtor's interest in MDF without the consent

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

of Herb Feinberg.  In addition, even upon succeeding in such litigation, the Trustee would have to locate buyers for these assets. The Trustee recognizes that the value of the Estate's assets has been detrimentally impacted by the Coronavirus pandemic, which lowers the probability of success in the valuation litigation if the Trustee expended the resources to undertake the valuation litigation.

The Trustee has considered that the Estate could attempt to sell Ms. Lipton's as well as the estate's interest in the New York Apartment under Bankruptcy Code §363(h).  However, the trustee would have to prove, among other things:

> the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

The fact that Ms. Lipton lives in the New York Apartment with 4 children makes this issue uncertain.

As for the sale component of the litigation, as a result of the Coronavirus, the Trustee is aware that the New York real estate market appears to be adversely impacted.

The Coronavirus also creates obstacles for the Trustee in locating a buyer for the shares of MDF as its business has been adversely affected.

The trustee is aware that the Operating Agreement of MDF contains limitations on transferability of the Estate's MDF's shares set forth under Section 12.1 of the MDF Operating Agreement, impacting the Trustee's ability to market and sell the Bankruptcy Estate's minority non-voting shares in MDF. Section 12.1 of the MDF Operating Agreement, governing transfer restrictions of any membership interests in MDF, provides the following limitations that bind the Trustee:

> 12.1    Transfer Restrictions. Except for Feinberg, no Member may transfer any of their Interest to any Person who is not a Member other than in compliance with the terms and conditions of Article 12. Notwithstanding the aforesaid, no Member may transfer any of their Interest without the consent of Feinberg…Any attempted transfer of any Interest that is made other than in compliance with the terms and conditions of this Article 12 shall be invalid and shall not be reflected on the Company's books.

*See* MDF Operating Agreement, § 12.1, p. 17.

As for the pre-petition State Court Action, the Trustee concludes that the merits of the State Court Litigation claims, or potential damages arising therefrom, are challenging and after deducting litigation costs, are precarious at best. Assuming, *arguendo*, that the Debtor's assertions in the State Court Litigation are correct, the potential recovery is insufficient to tax the Bankruptcy Estate with such costly litigation, in light of the allegations of Mr. Feinberg and MDF in the Section 523 adversary complaint alleged against the Debtor. Mr. Feinberg filed a Proof of Claim against the Debtor in the amount of $6,912,489.20, consisting of $761,613.01 in unpaid interest due and owing on a 2011 loan to Debtor, Mr. Feinberg's guaranty on the Deutsche Bank loan for the New York Apartment in the amount of $5,000,000, and a $1,150,876.19 loan reflected in a Promissory Note incurred by the Debtor. See POC No. 1. MDF filed a Proof of Claim against the Debtor in the amount of $1,974,495.65, consisting of a $500,833.33 Promissory Note the Debtor wrote for his benefit, misappropriation of funds for Debtor's personal use in the amount of $184,492, $34,399.32 loss to MDF for the under market interest rate Debtor loaned to himself from MDF and negative capital for double dipping against MDF from 2013 through 2017. *See* POC No. 2.

The Trustee has concluded that the litigation regarding the sale of the New York Apartment, MDF interest and the claim against MDF is certainly uncertain and likely to be costly and lengthy. Additionally, success in the litigation will only result in the ability to sell assets in an uncertain market. For these reasons, probability of success in the litigation is problematic. Accordingly, the first *A&C* factor favors approval of the settlement.

**B.    *Difficulties in Collection***

Collection is not implicated for purposes of this Motion, because the valuation litigation would ultimately result in a diminishment or increase in the distribution to the Creditors that are parties to the Settlement Agreement. As for the State Court Litigation, assuming that a judgment is obtained against MDF and Mr. Feinberg in the State Court Litigation, it would not be difficult to collect on it, but any judgment entered against MDF and Mr. Feinberg would undoubtedly result

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

in a lengthy and costly appeals process, notwithstanding the ability of MDF and Mr. Feinberg to post a bond to stay enforcement of any unlikely judgment obtained in the State Court Action. Thus, the second *A&C* Factor (difficulties in collection) therefore heavily favors approval of the settlement, given the nature of the litigation (valuation), which impacts distributions to creditors of the Estate.

**C.    *Complexity, Expense, Delay, and Inconvenience of the Litigation***

Litigating the State Court Litigation is fact-intensive and thus would be moderately complex. Given the financial nature of the allegations alleged in the State Court Litigation, financial experts and numerous witnesses would likely be involved in the discovery and ultimately the trial in the State Court litigation, which would be extremely time-consuming, and certainly be relatively expensive for the Trustee to pursue.  Given that the State Court Action is in its infancy and no activity occurred prior to the Debtor's bankruptcy filing, if the Trustee were to undertake the State Court Litigation, and reducing the litigation to judgment, would likely take between one to two years., as no discovery has been conducted in the State Court Action and no motion practice has taken place.  Further, any appeal would take another year to two years, adding further cost and delay to the Estate.

In terms of the complexity, expense and delay involved in litigating the valuation of the Estate's interest in MDF and the New York Apartment, to the extent any equity could be established, the expense of the experts would be high in the valuation dispute.

In addition to the valuation issues, without a settlement, the parties would litigate the Trustee's right to sell Ms. Lipton's interest in the New York Apartment and the sale of the MDF interest to anyone other than Herb Feinberg.

Because of the complexity, expense and delay involved in litigating this matter, especially given the additional layer of delay as a result of the Coronavirus and the impact on the judicial system, the third *A&C* factor heavily favors approval of the settlement.

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

Lewis Roca
ROTHGERBER CHRISTIE

**D.      Interests of the Creditors**

43.      The proposed settlement is in the best interests of the creditors because it is a quick resolution and maximizes the return to creditors.  The Creditors that are parties to the Settlement Agreement comprise the largest collective creditor group of the Bankruptcy Estate.  In the event the Bankruptcy Court approves the Settlement Agreement for the payment of $700,000.00, after the Bankruptcy Estate's administrative fees and costs are paid and after the DSO priority claim of Ms. Lipton in an amount not to exceed $35,000 is paid, the only remaining creditor to receive any distribution will be the IRS in connection with its secured claim of $48,901.28 and priority claim in the amount of $1,037,996.51 claimed as taxes or penalties under Section 507(a)(8). *See* POC No 8.  As a result, the IRS will be the only meaningful recipient of the benefit of the Settlement Agreement.

Given that the remaining non-priority unsecured creditors will not receive any distribution, it is in the best interests of the Bankruptcy Estate for the Trustee to expeditiously settle the dispute as to the value of the Estate's minority non-voting interest in MDF, the dispute regarding the value of the Estate's equity in the New York Apartment, and to resolve the issue of the division of the personal property in the New York Apartment and the rights and interests in the use of the Aspen Timeshare.  The Trustee submits that the Settlement Agreement is in the best interest of the Debtor's Bankruptcy Estate, given the elimination of rising administrative fees and costs that would have been attendant to the valuation battle relating to the value of the Estate's minority non-voting interest in MDF and the purported equity in the New York Apartment.

The Trustee thus believes that this settlement results in a quick, fair, and reasonable recovery for the creditors of the estate, factoring in the overall recovery, the relative costs associated with litigating outside of this settlement, namely the expense of expert witnesses and the expected delays and difficulties with any future litigation requiring evidentiary hearing, given

the obstacles resulting from the Coronavirus. Accordingly, the fourth *A&C* factor (interests of the creditors) favors settlement.

### E.    Conclusion

Based upon the foregoing, the Trustee, in her business judgment: (i) asserts that she has made an informed decision in entering into the Settlement Agreement; (ii) believes that the settlement between the Parties (as evidenced by the Settlement Agreement) is fair, equitable, and reasonable; and (iii) believes that approval of the Settlement Agreement is in the best interests of the Bankruptcy Estate and its creditors. The Creditors also maintain that the terms of the Settlement Agreement are fair, equitable, and reasonable.

## IV.    RELIEF REQUESTED

Based upon the foregoing, the Parties respectfully request that the Court approve the Settlement Agreement, pursuant to Bankruptcy Rule 9019, the *A&C* factors, and other applicable law as discussed above.

Dated this 6th day of April, 2020.

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

*/s/ Ogonna M. Brown*
Ogonna M. Brown, Esq.
Lewis Roca Rothgerber Christie LLP
3993 Howard Hughes Parkway, Suite 600 Las Vegas, NV 89169
*Attorneys for Creditors MDF Holdings, LLC, Tara Lipton, and Herbert Feinberg*

**SCHWARTZER & MCPHERSON LAW FIRM**

*/s/ Lenard Schwartzer*
Lenard E. Schwartzer, Esq.
Nevada Bar No. 0399
2850 South Jones Blvd., Suite 1
Las Vegas NV 89146
*Attorneys for Shelley D. Krohn, Chapter 7 Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of Lewis Roca Rothgerber Christie LLP, and that on the 6th day of April, 2020, I caused to be served a true and correct copy of **JOINT MOTION TO APPROVE SETTLEMENT UNDER RULE 9019** in the following manner:

☒ (ELECTRONIC SERVICE)  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL)  By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE)  That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

*/s/ Kennya Jackson*
An employee of Lewis Roca Rothgerber Christie LLP

00643376.1 AMSLLP
110809000.1

- 20 -

# EXHIBIT "1"

# SETTLEMENT AGREEMENT

This Settlement Agreement ("*Agreement*") is entered into on March 26, 2020, by and between the Bankruptcy Estate of HUNTER LIPTON ("*Debtor*"), by and through the Court appointed Chapter 7 Trustee Shelley D. Krohn ("*Trustee*"), in connection with Chapter 7 Bankruptcy Case pending in the United States Bankruptcy Court, District of Nevada, as Bankruptcy Case No. BK-S-19-13898-ABL (the "*Bankruptcy Estate*"), on the one hand; and MDF HOLDINGS, LLC, a Delaware limited liability company ("*MDF*"), HERBERT FEINBERG, individually ("*Mr. Feinberg*"), and TARA LIPTON, individually ("*Ms. Lipton*") (collectively, the "*Creditors*"), on the other hand. Each party may hereinafter be referred to as a "*Party*," or collectively as the "*Parties*".

## RECITALS

**WHEREAS,**

**Bankruptcy**

1.      On June 20, 2019 ("*Petition Date*"), Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby commencing bankruptcy Case No. BK-S-19-13898-ABL (the "*Bankruptcy Case*").

2.      Shelley D. Krohn is the duly appointed and acting Chapter 7 Trustee in the Bankruptcy Case.

**Debtor's Marriage And Divorce Action**

3.      Ms. Lipton and Debtor were married on January 19, 2003, in a civil ceremony in Palm Beach, Florida.

4.      There are four (4) minor children in the fourteen-year marriage, ranging in ages from 16 to 10.  No additional child is expected.

5.      Debtor, Ms. Lipton and the children reside at the residence located at 255 East 74th Street, Apartment 3A, New York, New York (the "*74th Street Apartment*") since 2009.  Title to the 74th Street Apartment is held in the joint names of Debtor and Ms. Lipton.

6.      Debtor and Ms. Lipton purchased a time share located at 315 East Dean Street (St. Regis Residence Club), Aspen Colorado 81611 during their marriage, title to which is not held in the Debtor's name (the "*Aspen Timeshare*").

7.      In or about April 2018, Debtor moved out of the 74th Street Apartment.

8.      On or around July 23, 2018, Ms. Lipton commenced divorce proceedings against Debtor by filing a Summons (and Notice of Automatic Orders pursuant to D.R.L. § 236 and Notice Concerning Continuation of Health Care Coverage and Notice of Guideline Maintenance) and Verified Complaint, in the Supreme Court of the State of New York, County of New York, assigned Index No. 307119/2018 ("*New York Divorce Action*").

9.      At the time Ms. Lipton commenced the New York Divorce Action, there was no judgment in any court for a divorce, and no other matrimonial action for divorce between Ms. Lipton and Debtor was pending in the New York or any other court of competent jurisdiction.

10.     As of the Petition Date, there was no judgement for divorce from the New York Court arising from the New York Divorce Action, and the New York Court has not made an adjudication of the division of assets or a distribution of assets relating to the Debtor, Ms. Lipton and the four (4) children of the marriage.

11.     On August 13, 2019, Ms. Lipton filed a proof of Claim in Debtor's Bankruptcy Case which includes a priority claim for $69,215 relating to her claim for pre-petition domestic support obligations.

**MDF and Debtor's Interest in MDF**

12.     MDF is a Delaware limited liability company which commenced operations in 2011.

13.     The ownership structure of MDF and each member's units and voting/approval rights as of the Petition Date is reflected in the MDF Amended and Restated Operating Agreement dated September 23, 2013 (the "*Operating Agreement*"), a true and correct copy of which is attached hereto as **Exhibit "A"**.

14.     In accordance with the Operating Agreement, Feinberg is MDF's Manager.

15.     Feinberg is also the managing member of Gotham Enterprises, LLC ("*Gotham*") and controls Gotham.

16.     As of the Petition Date, (i) Feinberg, together with Gotham, are the title holders of 59.65% interest in MDF, and (ii) Debtor is the title holder of 29.24% interest in MDF, consisting

of 250,000 Class A-1 units of MDF, which are non-voting shares. Debtor's Schedules filed in the Bankruptcy Action incorrectly reflect that the Debtor is the title holder of a 30.38% interest in MDF.

17.    In 2015, Gotham loaned $2,000,000 to MDF to fund another portion of a $3,000,000 acquisition by MDF.    The balance currently due and owing to Gotham from MDF as of February 29, 2020, is approximately $1,635,631.00.

18.    In accordance with the Operating Agreement Recital B, Feinberg "may amend this Agreement without any vote, consent, approval, authorization or other action of any Member (provided that notice of such amendment is given to all Members) to (a) subject to Section 11.12(a), designate the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series; or (b) reflect (i) the withdrawal, addition or substitution of Members, and (ii) the issuance of additional Units."

19.    Recital C further provides that "Section 14.2 of the Operating Agreement permits Feinberg to amend the Operating Agreement without any without any vote, consent, approval, authorization or other action of any Member."

20.    Debtor was suspended as CEO from MDF on February 11, 2019, and was terminated from MDF on May 17, 2019, before his June 20, 2019 bankruptcy filing.

21.    On May 13, 2019, Debtor commenced a lawsuit against MDF and Feinberg in the Eighth Judicial District Court, Clark County, Nevada, pending as Case No. A-19-794699-C, in Department No. 20 (hereinafter, the "*State Court Action*").

**The Cantal Trade Litigation**

22.    In 2017, Lokesh Melwani and Cantal Trade, Ltd. (collectively, "*Cantal Trade*") commenced litigation against Debtor, Eagle Point Financial, LLC and MDF, which case is currently pending in the United States District Court, Southern District of New York as Case No. 1:17-cv-08308-PGG/RJS ("*Cantal Trade Litigation*").

23.     Cantal Trade asserts claims, inter alia, of unjust enrichment and conversion against MDF on the basis that MDF was allegedly "created or founded by [debtor], using in part or in whole assets which are the rightful property" of Cantal Trade.

24.     As a result of the commencement of Debtor's Bankruptcy Case, the automatic stay is in place and the Cantal Trade Action is stayed solely as to Mr. Lipton.

25.     On September 11, 2019, New York District Court Judge Paul G. Gardephe, presiding over the Cantal Trade Action, ordered that Eagle Point and MDF proceed to defend the litigation Cantal Trade commenced against them pursuant to the Order (ECF No. 85).

26.     MDF has been forced to expend attorneys' fees to defend the litigation commenced by Cantal Trade, and is now exposed to potential liability for nearly $600,000.

**The Bankruptcy Proceeding**

27.     On July 22, 2019, the Trustee and Ms. Lipton entered into a Stipulation agreeing that the Bankruptcy Case did not stay the New York Divorce Action pending pre-petition, regarding the establishment of domestic support obligations, child custody and visitation matters, and the dissolution of the marriage.  (ECF No. 24).

28.     On August 13, 2019, Feinberg filed a Proof of Claim against the Debtor in the amount of $6,912,489.20, consisting of $761,613.01 in unpaid interest due and owing on a 2011 loan to Debtor, Feinberg's guaranty on the Deutsche Bank loan for the New York Apartment in the amount of $5,000,000, and a $1,150,876.19 loan reflected in a Promissory Note incurred by the Debtor. *See* POC No. 1.

29.     On August 13, 2019, MDF filed a Proof of Claim against the Debtor in the amount of $1,974,495.65, consisting of a $500,833.33 Promissory Note the Debtor wrote for his benefit, misappropriation of funds for Debtor's personal use in the amount of $184,492, $34,399.32 loss to MDF for the under market interest rate Debtor loaned to himself from MDF and negative capital for double dipping against MDF from 2013 through 2017. *See* POC No. 2.

30.     On September 23, 2019, MDF and Feinberg commenced an Adversary Proceeding Against Debtor for, among other things, fraud and misappropriation of company funds, pending as Adv. Case No. 19-01095-ABL ("*MDF Adversary Action*").

31.     On September 23, 2019, Ms. Lipton commenced an Adversary Proceeding Against Debtor for, among other things, a ruling to Determine Assets of the Estate Pursuant to 11 U.S.C. § 541 for the division of marital assets of the Debtor and Ms. Lipton and to determine the extent and scope of the nondischargeable debts of the Debtor under 11 U.S.C. § 523, pending as Adv. Case No. 19-01096-ABL ("*Lipton Adversary Action*").

32.     On October 23, 2019, the Trustee filed a Motion to Intervene as Defendant and Counter-Claimant in the Lipton Adversary Complaint (Adv. ECF No. 29).

33.     On October 30, 2019, Ms. Lipton stipulated to allow the Trustee to intervene as a real party in interest regarding the division of marital assets relating to assets of the Bankruptcy Estate as of the Petition Date, as set forth in the Stipulation to Grant Motion to Intervene as Defendant and Counter-Claimant and Vacate Hearing (Adv. ECF No. 34).

34.     On November 1, 2019, the Trustee filed an Answer and Counterclaim (Adv. ECF No. 36).

35.     On December 2, 2019, Ms. Lipton filed an Answer to Counterclaim in response to the Trustee's Counterclaim (Adv. ECF No. 38).

36.     On December 10, 2019, the Trustee filed a Motion for Partial Summary Judgment for Partial Judgment on the Pleadings ("*Motion for Summary Judgment*"), scheduled for hearing on January 28, 2020, at 10:00 a.m. (Adv. ECF No. 39).

37.     On February 25, 2020, Ms. Lipton filed an Opposition to the Motion for Summary Judgment (Adv. ECF No. 56).

38.     On March 3, 2020, the Trustee filed a Reply in Support of the Motion for Partial Summary Judgment for Partial Judgment on the Pleadings (Adv. ECF No. 59).

39.     On March 10, 2020, the Bankruptcy Court held a hearing on the Trustee's Motion for Partial Summary Judgment for Partial Judgment on the Pleadings (Adv. ECF No. 39).

Settlement Agreement - Page | 5
110821131.1

Thereafter, the Motion for Summary Judgment deemed *sub judice*, and the Court scheduled a hearing for April 9, 2020, at 3:00 p.m. for the sole purpose of issuing a ruling on the Motion for Summary Judgment.

40.    Simultaneously with the execution of this Agreement, the Trustee and Ms. Lipton entered into a Stipulation pursuant to which the Trustee withdrew the Motion for Summary Judgment and requested the entry of an order vacating the hearing for the oral ruling scheduled for April 9, 2020, at 3:00 p.m. as moot in light of this Agreement (the "*Vacatur Stipulation*").  (ECF No. 64).

## Purpose of this Agreement

41.    The Parties hereto have reviewed their respective claims and defenses, and have arrived at a settlement between them regarding the 74th Street Apartment and its contents, the Debtor's interest in MDF and the Aspen Timeshare, and agree to be bound by the terms and obligations of this Agreement, and do so freely and voluntarily, after having had the opportunity to seek the advice of counsel;

NOW, THEREFORE, in consideration of the obligations and representations set forth herein, the Parties agree as follows:

1.    **Whereas Clauses**.  The Whereas clauses to this Agreement are hereby incorporated into the body of this Agreement with the same full force and effect as if set forth at length herein.

2.    **Contingent on Bankruptcy Court Approval**.  The Parties acknowledge that this Agreement, and all obligations and releases contained herein, are contingent upon Bankruptcy Court approval under Bankruptcy Rule 9019.  The Trustee shall prepare and file a motion to obtain such approval (the "*Settlement Motion*").  The Trustee shall seek to have the Settlement Motion heard on shortened time.  However, if the Court declines to hear the matter on shortened time, it shall not affect the validity of this Agreement. All Parties hereto agree not to directly or indirectly oppose the Settlement Motion.  If the Bankruptcy Court does not substantially approve this Agreement, then this Agreement, and all of the obligations and releases contained herein, shall be null and void.

3.    **Effective Date**.  The effective date of this Agreement (the "*Effective Date*") shall be the date upon entry of a Bankruptcy Court order substantially approving this Agreement. All Parties hereto agree not to appeal, or file a motion to stay, any order substantially approving this Agreement.

4.    **Consideration**.  Upon execution of this Agreement, and no later than fifteen (15) business days after the entry of the Bankruptcy Court's order approving this Agreement, MDF, Feinberg and Ms. Lipton shall pay to the Debtor's Bankruptcy Estate the amount of Seven Hundred Thousand Dollars ($700,000.00) ("*Payment*") in exchange for the following consideration, which Payment must be received in full to effectuate this Agreement:

(a)    ***Transfer of Estate's Interest in MDF.***  Upon execution of this Agreement by all Parties, the Trustee shall execute a Bill of Sale and Assignment of 100% of the Estate's title and interest in MDF, including, but not limited to, the Estate's 29.24% interest in the form of 250,000 Class A-1 non-voting units of MDF in their entirety and any unissued shares in MDF, including any and all rights and obligations arising thereunder, including, but not limited to, any pre- or post-petition rights to an accounting, income distributions, net profits, capital contributions, capital accounts, elections, management, or compensation, as governed under the Operating Agreement, and any amendments thereto, by way of the Assignment and Bill of Sale ("*Assignment*") in the form attached hereto as **Exhibit "B"**, which will be held in trust by Trustee's counsel. Upon the entry of a Bankruptcy Court order approving this Agreement, in simultaneous exchange for payment of $550,000, the Trustee shall authorize her counsel to deliver the original Assignment to Mr. Feinberg's counsel Ogonna M. Brown, Esq. via hand delivery, which transfer shall be effective and filed with the New York Secretary of State, Delaware Secretary of State, and Nevada Secretary of State. Mr. Feinberg hereby consents to the transfer of the Estate's 100% interest in MDF to Mr. Feinberg or his assigns to be designated by Mr. Feinberg pursuant to Section 12.1 of the Operating Agreement.

(b)    ***Transfer of Deed in Favor of Ms. Lipton***.

(1)    Upon execution of this Agreement by all Parties, the Trustee shall execute a Grant, Bargain and Sale Deed ("New *York Deed*") transferring the Estate's title and interest in the 74th Street Apartment to Ms. Lipton in the form attached hereto as **Exhibit "C"**, which will be held in trust by Trustee's counsel.  Upon the entry of a Bankruptcy Court order approving this Agreement, in simultaneous exchange for payment of $100,000, the Trustee shall authorize her counsel deliver the original New York Deed to Ms. Lipton's counsel Ogonna M. Brown, Esq. via hand delivery, to be effective and recorded.

(2)    The Bankruptcy Estate shall be deemed to have waived all rights in the 74th Street Apartment including Debtor's survivorship rights.

        (c)        ***Transfer of Title in Personal Property in Favor of Ms. Lipton.***

        (1)        Upon execution of this Agreement by all Parties, the Trustee shall execute a bill of sale of the Estate's right, title and interest in any and all of the personal property and contents, including but not limited to, furniture, furnishings, artwork, and personalty, reposed in the 74th Street Apartment as of the Effective Date (the "*74th Street Contents*") and the Aspen Timeshare by way of a Bill of Sale in the form attached hereto as **Exhibit "D"**, which will be held in trust by Trustee's counsel. Upon the entry of a Bankruptcy Court order approving this Agreement, in simultaneous exchange for payment of $50,000, the Trustee shall authorize her counsel to deliver the original Bill of Sale to Ms. Lipton's counsel Ogonna M. Brown, Esq. via hand delivery, to be effective and filed with the New York Secretary of State and Nevada Secretary of State.

        (2)        The Bankruptcy Estate shall be deemed to have waived all rights in the contents of 74th Street Apartment and the Aspen Timeshare including Debtor's survivorship rights.

        (d)        ***Dismissal of State Court Litigation.***  Upon the execution of this Agreement by all Parties, the Trustee and her counsel shall execute the Stipulation and Order to Dismiss the State Court Action, with prejudice ("*State Court Dismissal Stipulation*"), in the form attached hereto as **Exhibit "E"**, which will be held in trust by Trustee's counsel.  Upon the entry of a Bankruptcy Court order approving this Agreement,  in simultaneous exchange for payment of $550,000, the Trustee shall authorize her counsel to deliver the original State Court Dismissal Stipulation to MDF and Feinberg's counsel Ogonna M. Brown, Esq. via hand delivery, to be filed with the Nevada State Court and recorded with the Clark County Recorder's Office.

        (e)        ***No Objection to Priority DSO Claim of Ms. Lipton of $35,000***. Subject to the Bankruptcy Court's approval of this Agreement, the Trustee agrees that she will not object to Ms. Lipton's DSO claim as long as the DSO claim does not exceed $35,000.00, which claim will be afforded priority under 11 U.S.C. § 523(a). The Trustee reserves the right to object to Ms. Lipton's priority claim in the event Ms. Lipton does not reduce her priority claim to $35,000.

        (f)        ***No Amendment of MDF and Feinberg Claims as Priority***. Subject to the Bankruptcy Court's approval of this Agreement, neither MDF nor Mr. Feinberg will amend their respective claims to assert a priority for Proof of Claim No. 1 and Proof of Claim No. 2.

        (g)        ***Division of Marital Assets***.  Subject to the Bankruptcy Court's approval of this Agreement, the Trustee shall not object to Ms. Lipton's amendment of her Proof of Claim No. 3 to reflect the division of the marital assets between the Debtor and Ms. Lipton as follows: Ms. Lipton may amend her proof of claim to attribute 50% of the value of the Estate's interest in MDF in the amount of $550,000.00.

        (h)        ***Transfer Tax for Estate's Transfer of New York Apartment***. The Trustee shall not be responsible for the payment of any conveyancing costs, transfer taxes, and

recording fees imposed on the transfer or recording of title of the 74th Street Apartment to Ms. Lipton's sole name.

(i)    ***Waiver and Release of Claims by Bankruptcy Estate***.    The Bankruptcy Estate waives any and all potential claims that may be held by the Bankruptcy Estate against Creditors.

5.    **Compromise of Disputed Claims / No Admission of Liability**.    It is understood and agreed that this Agreement is the good faith compromise of disputed claims.  The terms of this settlement are not intended to be, and shall not be, construed as, an admission by any party of any liability whatsoever, under any law or theory of liability.

6.    **Attorneys' Fees**.    With respect to all matters relating to the Bankruptcy Case and the State Court Litigation, each Party shall bear its own attorneys' fees and costs.

7.    **Governing Law; Jurisdiction**.    This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, with the exception of the division of the assets of Ms. Lipton and the Debtor as set forth herein, which shall be governed by New York law, and with the exception of the governance of MDF, which is governed by Delaware law. The U.S. Bankruptcy Court, District of Nevada, shall retain jurisdiction over performance of, enforcement of, or any disputes arising from or related to, this Agreement.

8.    **Authority**.    Each Party represents, warrants and covenants that the undersigned signatories for such Party have the full legal right, power and authority to bind that Party to this Agreement.  Each Party represents that he/she has received independent legal advice, or has had the opportunity to receive independent legal advice, with respect to the terms of and advisability of executing this Agreement.

9.    **Severability**.    This Agreement shall be enforced to the maximum extent permitted by law.  In the event that any one or more of the phrases, sentences, sections, or paragraphs contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having competent jurisdiction, or shall be or become invalid or unenforceable by virtue of any applicable law, the remainder of this Agreement shall be construed as if such phrases, sentences, sections, paragraphs or sections had not been inserted except when such construction shall constitute a substantial deviation from the general intent and purposes of the Parties as reflected in this Agreement.

10.    **Entire Agreement**.    This Agreement embodies the entire agreement and understanding by and between the Parties.  This Agreement supersedes any and all prior or concurrent agreements, understandings, statements, assurances, assumptions, premises, promises, agreements, discussions or representations, oral or written, relating to the foregoing matters, including oral agreements or representations, if any.  Neither Party has made any representations upon which the other Party has relied that are not contained in this Agreement relating to the foregoing matters.  No Party is relying on an unstated assumption, premise or condition not contained in this Agreement relating to the foregoing matters.

11.    **No Modification, Waiver, or Amendment**.  No modification, waiver, or amendment of any of the terms of this Agreement shall be valid unless in writing and executed by all Parties and approved by the Bankruptcy Court. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar or dissimilar nature. No course of dealing or course of conduct shall be effective to amend, modify or change any provision of this Agreement.

12.    **Counterparts**.  The Parties agree that this Agreement may be executed in counterparts, and may furthermore be executed by a Party on a scan of a counterpart executed by another Party.  The Parties agree to cause their counsel to retain the originals of signed counterparts until 15 days after the Effective Date, after which they may be disposed of without notice.

13.    **No Assignment**.   No Party may transfer or assign any of their rights, remedies or obligations under this Agreement.

14.    **Successors**.  This Agreement shall be binding upon and inure to the benefit of the Parties and to their successors-in-interest.

15.    **Further Assurances**.  The Parties shall take, or cause to be taken, all actions and shall do, or cause to be done, all things necessary, proper or advisable to consummate each of the agreements, promises, covenants, and obligations of such Party under this Agreement.

16.    **No Third Party Beneficiaries**.   Except as expressly stated in this Agreement, this Agreement shall not confer any rights or remedies on any person or entity other than the Parties and their respective successors and assigns. This Agreement does not serve as a release of any of Creditors' claims against Hunter Lipton, and Creditors shall not be barred from pursuing any and all actions or claims against Hunter Lipton in the pending Lipton Adversary, MDF Adversary, New York Divorce Action or the Cantal Trade Litigation, subject to the automatic stay.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**_AGREED:_**

**THE BANKRUPTCY ESTATE OF HUNTER LIPTON, Nevada Bankruptcy Case No. BK-S-19-13898-ABL:**

By: _____
    Shelley D. Krohn, *Trustee*

**MDF HOLDINGS, LLC:**

By: _____

Printed Name: _HARVEY M BERG_____

Its: _____CEO_____

**TARA LIPTON:**

By: _____

Printed Name: _____

**HERBERT FEINBERG:**

By: _____

Printed Name: _HERBERT FEINBERG____

00643192.2 AMSLLP
Settlement Agreement - Page | 11
110821131.1

*AGREED:*

**THE BANKRUPTCY ESTATE OF HUNTER LIPTON, Nevada Bankruptcy Case No.
BK-S-19-13898-ABL:**

By: _____
     Shelley D. Krohn, *Trustee*

**MDF HOLDINGS, LLC:**

By: _____

Printed Name: _HARVEY M BERG_

Its: _CEO_

**TARA LIPTON:**

By: _____

Printed Name: _____

**HERBERT FEINBERG:**

By: _____

Printed Name: _____

*AGREED:*

**THE BANKRUPTCY ESTATE OF HUNTER LIPTON, Nevada Bankruptcy Case No. BK-S-19-13898-ABL:**

By: _____
    Shelley D. Krohn, *Trustee*

**MDF HOLDINGS, LLC:**

By: _____

Printed Name: _____

Its: _____

**TARA LIPTON:**

By: _____ *Tara Lipton* _____

Printed Name: _____ *Tara Lipton* _____

**HERBERT FEINBERG:**

By: _____

Printed Name: _____

# EXHIBIT "A"

## MDF Operating Agreement

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**MDF HOLDINGS, LLC,**
**A Delaware limited liability company**

**Dated September 23, 2013, to be effective as of January 1, 2013**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED, OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

AMENDED AND RESTATED
OPERATING AGREEMENT
OF MDF HOLDINGS, LLC,
a Delaware limited liability company

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "*Agreement*") is entered into September 23, 2013 to be effective as of January 1, 2013, by and among Herbert Feinberg, Gotham Enterprises & Affiliates, LLC, Hunter Lipton, Harvey Berg, David Leone, Ed Hines and those Persons who may be added to Schedule A from time to time pursuant to Section 14.1 below, as Members of MDF HOLDINGS, LLC, a Delaware limited liability company (the "*Company*"). This Agreement shall expressly supersede (i) that certain Operating Agreement of GLS, LLC (the predecessor name to the Company) dated February 10, 2011, and (ii) that certain Operating Agreement of the Company dated August 15, 2012 and effective April 19, 2011 (the "*Prior Operating Agreement*").

R E C I T A L S

A.    Whereas, on February 10, 2011, the Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware in accordance with and pursuant to the Delaware Limited Liability Company Act (the "*Act*"), and on April 18, 2011, an amendment to the Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware in accordance with and pursuant to the Act, changing the name of the Company to MDF HOLDINGS, LLC.

B.    Whereas, Section 14.2 of the Prior Operating Agreement provides that this Agreement and the Certificate of Formation may be amended in whole or in part upon the approval of Feinberg and the Majority of the Class A Members, each of whom have consented to the amendment and restatement of this Agreement as provided herein. Subject to the provisions of Section 11.3, Feinberg may amend this Agreement without any vote, consent, approval, authorization or other action of any Member (provided that notice of such amendment is given to all Members) to (a) subject to Section 11.12(a), designate the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series; or (b) reflect (i) the withdrawal, addition or substitution of Members, and (ii) the issuance of additional Units. Notwithstanding the foregoing, a majority in interest of the members holding any class of Class A Units must consent to any amendment of this Agreement that would materially adversely affect such class in a manner that is disproportionate from any other class.

C.    Whereas Section 14.2 of the Operating Agreement permits Feinberg to amend the Operating Agreement without any without any vote, consent, approval, authorization or other action of any Member.

D.    Whereas, Section 14.1 of the Operating Agreement states: "Admission of Members. New Members may be admitted to the Company only upon the written approval of Feinberg and a Majority of the Class A Members and shall be admitted upon such terms and conditions as Feinberg and a Majority of the Class A Members may determine, consistent with

1

this Agreement, the Company's Certificate of Formation and any applicable provision of law or rule of a governmental agency or self-regulating organization which has jurisdiction over the business of the Company. For purposes of clarity, subject to Section 11.3 and Section 11.12(a), Feinberg is expressly authorized to determine and alter the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series."

      E.      Whereas, Feinberg and the Class A Members desire to amend and restate the Prior Operating Agreement as set forth herein such that this Agreement shall hereafter govern the rights, preferences, privileges and restrictions of the Members of the Company.

**A G R E E M E N T:**

      In consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**ARTICLE 1**
**FORMATION OF LIMITED LIABILITY COMPANY**

      1.1      <u>Formation</u>. The parties acknowledge the formation of a limited liability company under the provisions of the Act and, except as herein otherwise expressly provided, the rights and liabilities of the Members shall be as provided in that Act, as amended from time to time.

      1.2      <u>Certificate of Formation</u>. On February 10, 2011, the Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware in accordance with and pursuant to the Act, and on April 18, 2011, an amendment to the Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware in accordance with and pursuant to the Act, changing the name of the Company to MDF HOLDINGS, LLC.

      1.3      <u>Maintenance of Status</u>. The Board of Managers shall take such steps as are necessary to (a) maintain the Company's status as a limited liability company formed under the laws of the State of Delaware and its qualification to conduct business in any jurisdiction where the Company does business and is required to be qualified, and (b) ensure that the Company shall continue to be treated as a partnership for tax purposes.

      1.4      <u>Waiver of Right of Partition</u>. Except as expressly provided in this Agreement, no Member may, either directly or indirectly, take any action to require partition of the Company or of any of the Company's assets or properties or cause the sale of any of the Company's assets or properties without the consent of the Board of Managers; and, notwithstanding any provision of law to the contrary, each Member (and his or her legal representative, successor or assign) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his or her Interest, or with respect to any assets or properties of the Company.

2

## ARTICLE 2
## NAME

The business of the Company shall be conducted under the name "**MDF HOLDINGS, LLC,**" or such other name as the Board of Managers shall hereafter designate.

## ARTICLE 3
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

3.1     "*Act*" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

3.2     "*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  As used herein, the term "control" means:  (i) the power to vote at least fifty percent (50%) of the voting power of a Person, or (ii) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.  In addition, any Person who is a member, manager or executive officer of the Company, or an Affiliate of any of the foregoing, shall be deemed an "Affiliate" of the Company.

3.3     "*Agreement*" means this Operating Agreement, as amended, modified or supplemented from time to time.

3.4     "*Adjusted Capital Account Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after giving effect to the following adjustments:  (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).  This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

3.5     "*Base Value*" means the fair market value of the Company as an entity, determined in good faith by the Manager at the time of issuance of a Profits Interest, which determination shall be binding on the Company and the holder of the Profits Interest.

3.6     "*Board of Managers*" means the board of Managers of the Company established pursuant to Section 11.1.

3.7     "*Capital Account*" means, with respect to any Member, the capital account maintained for such Member in accordance with the following provisions:

3

3.7.1   To each Member's Capital Account there shall be credited the capital contributions of any such Member (including, the value of any property contributed to the Company), the amount of any Company liabilities assumed by any such Member or which are secured by any property distributed to any such Member and the distributive share of Profits distributed to any such Member.

3.7.2   To each Member's Capital Account there shall be debited the amount of cash and the value of any property distributed to any such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses, if any, and the amount of any liabilities of any such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

3.7.3   In the event all or a portion of a Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

3.7.4   Where appropriate in determining the amount of any liability for purposes of this Agreement, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and the Regulations promulgated thereunder.

3.8   "*Change in Control*" shall mean (a) the acquisition after the date of this Agreement, directly or indirectly, by any Person or group (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of the beneficial ownership of securities of the Company possessing more than 50% of the total combined voting power of all outstanding securities of the Company; (b) a merger, consolidation or other similar transaction involving the Company, except for a transaction in which the holders of the outstanding voting Units of the Company immediately prior to such merger, consolidation or other transaction hold, in the aggregate, securities possessing more than 50% of the total combined voting power of all outstanding voting securities of the surviving entity immediately after such merger, consolidation or other transaction; or (c) the sale, transfer or other disposition (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company.

3.9   "*Class A Member*" refers to the Class A Members set forth on Schedule A or to any other person or entity who succeeds them in that capacity as permitted in this Agreement.

3.10   "*Class A Units*" means the interest of a Class A Member in the income, gains, losses, deductions, credits and distribution of the company as set forth on Schedule A and as otherwise set forth herein.

3.11   "*Class A-1 Member*" refers to the Class A-1 Members set forth on Schedule A or to any other person or entity who succeeds them in that capacity as permitted in this Agreement.

3.12   "*Class A-1 Units*" means the interest of a Class A-1 Member in the income, gains, losses, deductions, credits and distribution of the company as set forth on Schedule A and as otherwise set forth herein.

3.13   "*Class B Member*" refers to the Class B Members set forth on Schedule A or to any other person or entity who succeeds them in that capacity as permitted by this Agreement.

4

3.14    "*Class B Units*" means the interest of a Class B Member in the income, gains, losses, deductions, credits and distributions of the Company as set forth on Schedule A and as otherwise set forth herein.  Class B Units are intended to be treated as Profits Interests.

3.15    "*Class C Member*" refers to the Class C Members set forth on <u>Schedule A</u> or to any other person or entity who succeeds them in that capacity as permitted by this Agreement.

3.16    "*Class C Units*" means the interest of a Class C Member in the income, gains, losses, deductions, credits and distributions of the Company as set forth on Schedule A and as otherwise set forth herein.

3.17    "*Code*" means the Internal Revenue Code of 1986, as amended.

3.18    "*Company*" means the limited liability company formed pursuant to the filing of the Certificate of Formation, as said Company may from time to time be constituted.

3.19    "*Company Business*" means initially the operation of a telecommunications business focusing on providing targeted media to incoming telephone callers, as well as any other lawful act or activity for which limited liability companies may be organized under the laws of the State of Delaware.

3.20    "*Company Equity Interests*" shall have the meaning ascribed in <u>Section 7.6.</u>

3.21    "*Distributable Cash*" the gross amount of cash from Company operations (including, but not limited to, licensing revenues, royalties, sales, dispositions and refinancings of Company property, and all principal and interest payments with respect to any note or other obligation received by the Company in connection with sales or other dispositions of Company property), less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, research and development (to the extent approved by Feinberg), capital improvements, replacements and contingencies, all as determined by Feinberg in good faith. "*Distributable Cash*" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances (except to the extent cash is set aside to pay or establish a reserve for such items), but shall be increased by any reductions of reserves previously established under this <u>Section 3.21</u>.

3.22    "*Feinberg*" means Herbert Feinberg, or his successor(s) in interest as may be appointed pursuant to <u>Section 11.1(b)</u>. "*Herbert Feinberg*" means Herbert Feinberg and/or his successor (s) in interest other than those successor(s) in interest who may be appointed pursuant to <u>Section 11.1(b)</u>.

3.23    "*Interest*" or "*Interests*" means an ownership interest in the Company, which includes a Member's share of the Profits and Losses of the Company, a Member's right to receive distributions of the Company's assets, a Member's right to vote or participate in the management of the Company as permitted in this Agreement, and a Member's right to information concerning the business and affairs of the Company, as provided in this Agreement and under the Act.  Unless otherwise designated by Feinberg in writing, Interests shall at all times be evidenced by Units, which may be divided into such classes and such number of series as Feinberg may determine from time to time in accordance with the terms hereof.

5

3.24 "*Manager*" Except as otherwise provided herein, means the Manager and the Associate Manager of the Company, appointed in accordance with Article 11.

3.25 "*Member*" or "*Members*" mean, effective as of the date first above written, those Persons identified on Schedule A hereto, and any Persons who may in the future be admitted to the Company as Members in accordance with Article 14, and transferees of Interests who have become Members pursuant to Article 14. A Member may include any individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust, association or other entity, whether domestic or foreign.

3.26 "*Net Proceeds*" means the aggregate cash proceeds and value of shares of stock (if any) received by the Members of the Company in respect of their ownership in the Company or by the Company in respect of its assets or in exchange for the issuance of Units in the event of a Change of Control, net of any and all costs and expenses incurred in connection with the Change of Control, including but not limited to broker fees, attorneys' fees and accountants' fees. For the purposes hereof, the value of shares of stock received in any Change of Control shall be the value assigned to such shares by the parties to such Change of Control, or in the absence of such determination, the value of the shares as determined by the Company's Board of Managers at its sole and absolute discretion.

3.27 "*Percentage Interest*" means, subject to Section 7.5, the percentage of all Interests held hereunder, as represented by each Member's Units and set forth on Schedule A, as amended from time to time; *provided, however*, if any authorized Class B Units shall not have been issued or allocated at the time any determination of "Percentage Interest" is made for any purpose hereunder, the Percentage Interest allocated to such authorized but unissued Class B Units shall be allocated pro rata solely among the Class A and Class A-1 Members.

3.28 "*Person*" means an individual, a partnership, as corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other form of legal entity.

3.29 "*Profits Interest*" means an interest in the Company as defined in Internal Revenue Service Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Internal Revenue Service Revenue Procedure 2001-43, 2001-2 C.B. 191, with the understanding that a Profits Interest does not give a holder of such an interest a share of the proceeds in the event that on the issue date of such Profits Interest the Company's assets were sold at fair market value and the proceeds of sale were distributed in complete liquidation of the Company to the Members. A holder of a Profits Interest has a right to participate in future earnings and growth beginning on its issue date, but is not entitled to any earnings or growth accruing prior to the respective issue date of the Profits Interest (i.e., the economic effect of a Profits Interest is to value it at zero ($0) as of the issue date). For the avoidance of doubt, no Person shall be deemed to own or hold any Profits Interest hereunder unless such Person has signed a copy of this Agreement.

3.30 "*Regulations*" means the Treasury Regulations promulgated under the Code.

3.31 "*transfer*" shall mean any transfer, sale, assignment, gift, pledge or other disposition or encumbrance.

6

3.32    "*Units*" shall mean those units (i) held by each Member, as set forth on Schedule A, as amended from time to time, (ii) evidenced by a certificate issued by the Company in the form of Exhibit A, and (iii) which represent the Interests of Members hereunder, as applicable. As of the date of this Agreement, the Company has authorized four classes of Units, designated respectively as "Class A Units," "Class A-1 Units" "Class B Units" and "Class C Units." Each class of Units has such rights, preferences, privileges and restrictions as set forth in this Agreement. The term "Units" shall refer the Class A Units, Class A-1 Units, Class B Units and Class C Units collectively and the term "Unit" shall mean a Class A Unit, Class A-1 Unit, Class B Unit or Class C Unit.

## ARTICLE 4
## NATURE OF BUSINESS

4.1    Business Purpose. The purpose and business of the Company is to engage in any lawful act or activity related thereto for which limited liability companies may be organized under the laws of the State of Delaware.

4.2    Except as provided in Section 4.3 herein as expressly set forth in this Agreement, any Member or Manager may conduct any business or activity whatsoever without any accountability to the Company or to any other Member. Each Member understands that the other Members, Managers and their Affiliates may be interested, directly or indirectly, in various other investments, businesses, operations and undertakings. Neither the Company nor any Member shall have any right in or to any such independent venture or investment or the revenues or profits derived therefrom. Subject to the terms and provisions of this Agreement, a Member or Manager may be compensated for performing services to the Company in its capacity as an employee or consultant thereto or with another entity. The foregoing provisions shall at all times be subject to any other provisions in any services or consulting agreement entered into by and between any Member and/or Manager and the Company, that has been authorized and approved in accordance with the terms and provisions of this Agreement. Notwithstanding the foregoing, no Member, Manager nor any Affiliate thereof, shall engage or possess an interest in, be employed by, or provide personal or consulting services to any business venture engaged in the Company Business.

4.3    Except for Herbert Feinberg and/or Gotham Enterprises & Affiliates, LLC (directly and/or indirectly), each of the Members covenants and agrees not to directly and/or indirectly without the consent of Feinberg establish, open, be engaged in, or in any manner whatsoever become interested, directly or indirectly, as employee, owner, partner, agent, stockholder, director, officer or otherwise, in any business, trade or occupation which competes with the business of the Company for the period(s) hereinafter set forth. The foregoing covenant not to compete shall remain in full force and effect for all of the following time periods: (a) during the entire time that such Member is employed by the Company, including any periods of temporary or permanent disability; and (b) during the entire time that such Member is the record owner or beneficial owner of any interest in the Limited Liability Company, provided that the Company is actively engaged in business activity and/or is making continued good faith efforts to engage in business activity; and (c) for a period of two (2) years after such Member's retirement from or termination of employment by the Company; and (d) for a period of two (2) years after the sale or other disposition of all of such Member's interest in the Company. It is

agreed that Herbert Feinberg and/or Gotham Enterprises & Affiliates, LLC may directly and/or indirectly engage in business, trade or occupation which competes with the business of the Company.

## ARTICLE 5
### TERM

The term of the Company shall commence on the date hereof perpetual unless terminated as provided in this Agreement.

## ARTICLE 6
### PRINCIPAL PLACE OF BUSINESS

The principal business office of the Company shall be ████████████████ ████████████████, or at such other place as may be designated by the Board of Managers from time to time.

## ARTICLE 7
### CAPITAL AND CONTRIBUTIONS; DESIGNATION OF UNITS

7.1    <u>Initial Capital Contribution</u>.  The Members have made the initial contributions to the capital of the Company set forth on <u>Schedule A</u> attached hereto.  Upon admission subsequently admitted Members shall be obligated to contribute to the capital of the Company, as an initial capital contribution, such amount as is determined in the sole and absolute discretion of the Board of Managers to be the fair market value of such Units.

7.2    <u>Liability to Creditors and Additional Contributions</u>.  Except as provided in <u>Section 7.1</u>, or as otherwise may be determined by the Members, Members shall not be liable to creditors of the Company, and shall not be required to make additional capital contributions to the Company or to restore all or any portion of a deficit balance in such Member's Capital Account with the Company.

7.3    <u>No Interest on Contribution</u>.  No Member shall have the right to receive interest on his or her capital contributions to the Company.

7.4    <u>Capital Accounts</u>.  Capital Accounts shall be maintained for each Member in accordance with section 704(b) of the Code and the Regulations promulgated thereunder.

7.5    <u>Designation of Units</u>.  The Company hereby authorizes 510,000 Units as Class A Units (voting), 250,000 Units as Class A-1 Units (non-voting), 145,000 Units as Class B Units (non-voting and treated as Profits Interests) and 95,000 Units as Class C Units (non-voting).  The Class A-1 Units, Class B Units and Class C Units shall have no voting or approval rights, except as may be required by law, and, as used herein, the phrases "approval," "consent of Feinberg," "vote" or any similar phrase, shall mean the approval, consent or vote of a majority of the Percentage Interests of the holders of the Class A Units. The Board of Managers may increase the number of authorized Units and/or create a new class of Units from time to time, so long as

such Units are sold at the fair market value thereof, as determined by Feinberg in his sole and absolute discretion. Notwithstanding any other provision of this Agreement, if any authorized Class B Units shall not have been issued or allocated at the time any determination of "Percentage Interest" is made for any purpose hereunder, the Percentage Interest allocated to such authorized but unissued Class B Units shall be allocated pro rata solely among the Class A and Class A-1 Members.

**ARTICLE 8**
**DISTRIBUTIONS**

8.1    <u>Distributions in General</u>.  Distributable Cash (other than in connection with the dissolution of the Company) shall be distributed to and among the Members at such times as the Board of Managers may determine, as follows, but disregarding for this purpose any Class B Units until such time all distributions equal the Base Value of such Class B Units:

8.1.1    First, Distributable Cash shall be distributed as a "tax distribution" in accordance with <u>Section 8.6</u> below;

8.1.2    Finally, among the Members pro rata, in accordance with their Percentage Interests; *provided, however*, that such Distributable Cash shall actually be distributed to the holders of the Class B Units and Class C Units pro rata, in accordance with their Percentage Interests, but such portion of such Distributable Cash which would otherwise be distributed to the holders of the Class A Units and Class A-1 Units shall be retained by the Company and maintained as a positive balance in the Capital Accounts of such Class A Members and Class A-1 Members until such time as the Managers determine to release such distribution to such Class A Members and Class A-1 Members.  Such Capital Account balances of the Class A and Class A-1 Members shall bear interest at the rate of Deutsche Bank prime interest plus two (2%) per cent.

The Members acknowledge and agree that Net Proceeds generated from a Change of Control or dissolution of the Company shall be allocated among and/or distributed to and among the Members, as applicable, at such times as the Board of Managers may determine, as follows:

8.1.3    First, to repay all loans to the Company (including loans made by Members);

8.1.4    Next, to the Members pro rata to the extent any such Member's Capital Account has a positive balance (including accrued interest as provided herein), until such Capital Accounts are reduced to zero; and

8.1.5    Finally, among the Members pro rata, in accordance with their Percentage Interests.

8.2    <u>Form of Distribution</u>.  No Member, regardless of the nature of a Member's capital contributions, shall have the right to demand and receive any distribution from the Company in any form other than cash.  Further, no Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of cash being made to

9

other Members. A Member may be compelled, however, to accept an in-kind asset distribution if such asset is being distributed proportionately to all Members.

8.3     Deduction of Taxes. Each Member acknowledges and agrees that the Company may be required to deduct and withhold tax or to fulfill other obligations of such Member on any amount distributed or allocated by the Company to such Member or to any assignee of any such interest (or the related Percentage Interest). Each Member shall promptly furnish the Tax Matters Partner with an Internal Revenue Service Form W-8, Form W-9 or Form 1001, as applicable. All amounts so withheld with respect to such Member shall be treated as amounts distributed to such Member pursuant to Section 8.1 for all purposes under this Agreement.

8.4     Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or paid by a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

8.5     Limitation on Distributions. No distribution shall be made if, after giving effect to the distribution (a) the Company would not be able to pay its debts as they become due in the usual course of business or (b) the Company's total assets would be less than the sum of its total liabilities.

8.6     Tax Distributions. For each fiscal year, unless Feinberg determines that there are insufficient cash reserves to meet the expenses of the Company in the ordinary course of business or that any distributions pursuant to this Section 8.6 would breach or in any manner violate any covenant of the Company with any third party or would render the Company insolvent or otherwise be contrary to law, the Company shall make a distribution to each Member that is calculated to pay the federal income taxes on such Member's distributive share of Profits for that fiscal year allocated pursuant to Article 9 below (taking into account the tax benefit from any ordinary loss or net capital loss allocated as an item of net income) (each a "**Tax Distribution**"). Any such Tax Distributions shall be determined for the Members as a group based on the highest applicable marginal tax rate in effect for the fiscal year with respect to which such Tax Distribution is being made (regardless of whether such Tax Distribution is made during such year or in the first quarter of the next fiscal year) and shall be made to the Members pro rata in proportion to their respective Percentage Interests. Any such Tax Distributions shall be reduced (but not below zero) by the amount of all other distributions to the Member during that year made pursuant to Section 8.1 hereof, but not by any other distributions. Feinberg shall endeavor to approve Tax Distributions so that the Company may make any such Tax Distributions by not later than March 31 following each calendar year.

**ARTICLE 9**
**ALLOCATIONS OF PROFITS AND LOSSES**

9.1     Allocation of Profits and Losses. The Profits or Losses for each fiscal period of the Company shall be allocated to the Members in such a manner that, at the end of such fiscal period, the Capital Account of each Member shall, to the extent possible, equal the amount

which would have been distributed to such Member pursuant to a hypothetical liquidation. For this purpose, a hypothetical liquidation means that all assets of the Company are disposed of in a taxable disposition for the "book" value of such assets (but in the case of assets subject to the rules governing minimum gain chargeback or and qualified income offset, such provisions would apply), the debts of the Company are paid, and the remaining amounts are distributed to the Members pursuant to Section 8.1. If for any fiscal period, such an allocation of Profits or Losses does not permit the Capital Accounts of Members to be made to equal the amount which would have been distributed to Members pursuant to a hypothetical liquidation, then instead of allocating Profits or Losses, a pro rata share of individual items of gross income, gain, loss or deduction (which were the components of Profits or Losses) shall be allocated among the Members in such a manner that, at the end of such fiscal period, the Capital Account of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a hypothetical liquidation.

9.2    Limitation on Losses. Losses allocated pursuant to Section 9.1 shall not exceed the maximum amount of Losses that can be so allocated without causing a Member to have an, or to increase an existing, Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.1, the limitation set forth in this Section 9.2 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations. All Losses in excess of the limitation set forth in this Section 9.2 shall be allocated to the other Members accordance with the percentage determined by dividing their Percentage Interests by the aggregate Percentage Interests held by all Members receiving the allocation (but excluding for this purpose the Percentage Interests held by Members not receiving the allocation).

9.3    Special Allocations. To the extent appropriate, as determined by Feinberg in his discretion, the special allocation and other applicable rules of Section 1.704 of the Regulations (including without limitation the so-called "minimum gain chargeback" and "qualified income offset") shall apply. Further, Feinberg shall have the absolute power and authority to specially allocate or re-allocate items of Company income, gain, loss, deduction and credit if Feinberg, after consultation with the Company's accountants, deems such allocations to be necessary or appropriate to equitably reflect the Members' various interests in the Company.

9.4    Change in Interest. If there is a change in Members or in the respective holdings of Percentage Interests or in the respective rights or obligations appurtenant to the Percentage Interests (caused, for example, by an admission of a new Member), allocations under this Article 9 for a taxable year among the Persons who are or were Members shall be made in the manner determined to be required under the Code and, if more than one method is determined to be permitted, then by the method selected as deemed appropriate by Feinberg , taking into account both the principles of substantial fairness and convenience of administration.

9.5    Profits and Losses. For purposes of this Agreement, the terms "*Profits*" and "*Losses*" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in

11

taxable income or loss); *provided, however,* for purposes of computing such taxable income or loss, (i) such taxable income or loss shall be adjusted by any and all adjustments required to be made in order to maintain Capital Account balances in compliance with Treasury Regulation Sections 1.704-1(b) and (ii) any and all items of gross income or gain and/or "nonrecourse deductions" specially allocated to any Member pursuant to Section 9.3 shall not be taken into account in calculating such taxable income or loss.

## ARTICLE 10
## BOOKS AND RECORDS; TAX MATTERS PARTNER

10.1    Books. There shall be maintained and kept at all times during the continuation of the Company, proper and usual books of account which shall accurately reflect the condition of the Company and shall account for all matters concerning the management thereof; which books shall be maintained and kept at the principal office of the Company or at such other place or places as the Board of Managers may from time to time determine. The Company's books and records shall be kept on the accrual basis.

10.2    Fiscal Year. The fiscal year of the Company shall end on December 31 of each year.

10.3    Election of Partnership Treatment. The Members shall elect partnership treatment of the Company as provided under the rules of the Internal Revenue Service.

10.4    Tax Matters Partner. The tax matters partner of the Company within the meaning of Internal Revenue Code Section 6231(a)(7) shall be Hunter Lipton.

## ARTICLE 11
## MANAGEMENT AND RIGHTS

11.1    The Board of Managers.

(a)    The business of the Company shall be managed by a Board of Managers. A Member shall not participate in the day-to-day operation of the business affairs of the Company. A Manager need not be a Member. The Board of Managers shall exercise its power and authority in accordance with this Agreement.

(b)    The Board of Managers shall be comprised of two (2) Managers, or such other number as determined from time to time by the Board of Managers. All of the Managers shall be elected, and may be removed or replaced solely, by the holders of a majority of the outstanding Class A Units, which such Managers shall initially be Herbert Feinberg, Manager, and Hunter Lipton, Associate Manager. Herbert Feinberg may from time to time appoint a successor Manager to himself, including without limitation, in the event that is may be unwilling or unable (including upon his death) to serve as a Manager of the Company (the "***Successor Manager***"). No appointment of a Successor Manager shall be effective unless in writing signed by Herbert Feinberg. In the event that Herbert Feinberg shall not have made any contrary appointment of a Successor Manager in writing prior to his death or incapacity, and at such time

12

Hunter Lipton shall still be serving as Associate Manager, then Hunter Lipton shall succeed Feinberg as the Manager.

(c)     With respect to any provision(s) and/or terms of this Agreement that require the consent, approval, decision and/or an act of Feinberg and if Feinberg is deceased and/or totally disabled, then the consent, approval, decision and/or act that was required by Feinberg is replaced with the consent, approval, decision and/or an act of Hunter Lipton, if he is still a Member of the Company and actively associated with the Company, with the advanced knowledge of Harvey Berg, if he is still a Member of the Company and actively associated with the Company.

(d)     Each Manager shall hold office until such Manager's death, incapacity, resignation or removal, or until such Manager's successor is duly elected and qualified.  A Manager may resign at any time upon written notice to the Company.

11.2    <u>Management Powers</u>.  Subject to <u>Section 11.12</u> and <u>Section 11.3</u> and other provisions of this Agreement, the Board of Managers has responsibility for the general supervision, direction, and control of the business of the Company, and the general powers and duties of management typically vested in the officers of a corporation, including, but not limited to, the right to enter into and carry out contracts of all kinds; to employ employees, agents, consultants, counsel and advisors on behalf of the Company; to lend or borrow money and to issue evidences of indebtedness; to bring and defend actions in law or at equity; to buy, own, manage, sell, lease, mortgage, pledge or otherwise acquire or dispose of the Company property.  Without limiting the generality of this <u>Section 11.2</u>, the Board of Managers shall have power and authority, to act on behalf of the Company and subject to the limitations of the Act and the limitations set forth in <u>Section 11.3</u> and <u>Section 11.12</u> below and elsewhere in this Agreement:

(a)     To enter into, terminate and amend intellectual property licensing agreements;

(b)     To commence, pursue and settle or compromise litigation and arbitrations;

(c)     To acquire, sell, transfer, exchange, lease or dispose of property from or to any Person as the Board of Managers may determine;

(d)     To borrow money for the Company from banks, other lending institutions, or any Manager individually on such terms as the Board of Managers deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(e)     To purchase liability and other insurance to protect the property and business of the Company;

(f)     To hold and own any Company real and personal properties in the name of the Company;

13

(g)     To invest any funds of the Company temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(h)     To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of property of the Company; assignments; bills of sale; leases; partnership agreements; and any other instruments or documents necessary or appropriate, in the opinion of Feinberg, to the business of the Company;

(i)     To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(j)     To retain and compensate employees and agents generally, and to define their duties;

(k)     To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose necessary or appropriate to the conduct of the business of the Company;

(l)     To pay reimbursement from the Company of all expenses of the Company reasonably incurred on behalf of the Company;

(m)     With respect to clauses (a), (b), (c), (d), (f) and (i) of this Section 11.2, and clauses (h) and (k) of this Section 11.2 to the extent they obligate the Company to incur in excess of $100,000, the sole approval of Feinberg shall be required; and

(n)     To do and perform all other acts as may be necessary or appropriate to the conduct of the business of the Company.

11.3    <u>Action of the Board of Managers; Meetings; Written Consent</u>.  Unless this Agreement shall expressly provide for a matter to be approved by Feinberg, in all matters pertaining to the action of the Board of Managers, the concurrence and joinder of both Managers (or a sole manager if there shall only be one) shall be required.  Regular meetings of the Board of Managers shall be held at least once every sixty (60) days unless otherwise determined by the Board of Managers.  Regular and special meetings of the Managers may be called by any Manager.  All meetings shall be held upon two (2) business days notice delivered personally or by telephone, email or facsimile.  Except as to matters requiring only the consent and/or the approval of Feinberg, all authorized Managers are required to constitute a quorum of the Board of Managers for the transaction of business.  Action required or permitted to be taken at a meeting of the Board of Managers or by Feinberg alone may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed, as the case may be, by all of the Managers constituting the Board of Managers or by Feinberg.  Action taken under this Section 11.3 is effective when, as the case may be, all of the Managers constituting the Board of Managers with the concurrence of Feinberg or Feinberg have signed the consent, unless the consent specifies a different effective date.  In the event the Managers are at any time unable to agree on any matter not requiring the sole vote, approval and/or the consent

14

of Feinberg, they shall meet to discuss the matter on at least two separate occasions in an effort to resolve the deadlock in good faith. In the event that such deadlock cannot be so resolved, the matter shall be decided by Feinberg.

11.4    <u>Reliance on Manager's Signature</u>.    Every contract, deed, mortgage, lease and other instrument executed by a Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that, at the time of the delivery thereof, (i) the Company was in existence, (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager, and (iii) the execution and delivery of such instrument was duly authorized by the Board of Managers.

11.5    <u>Right to Appoint Officers</u>.    Feinberg may appoint a president, a chief executive officer, a chief financial officer, a secretary and such other officers of the Company as appropriate, each of whom shall hold office for such period, have such authority and perform such duties as Feinberg may determine.

11.6    <u>Bank Accounts</u>.    The funds of the Company shall be deposited in such bank account or accounts, or invested in such interest-bearing or non-interest bearing investments, as shall be designated by the Board of Managers.    All withdrawals from any such bank accounts shall be made by a Manager or a designated officer of the Company.    Company funds shall be separately identifiable from and not commingled with those of any other Person.    A withdrawal of an amount in excess of $50,000 dollars and/or the issuance of a check for more than an amount of $100,000 (or any series of checks written to the same or related payee within a sixty (60) day period in excess of such amount) shall require the co-signature of Feinberg.

11.7    <u>Reliance Upon Advisors</u>.    The Board of Managers may consult with legal or other counsel chosen by the Board of Managers and any act or omission suffered or taken by him on behalf of the Company or in furtherance of the interests of the Company in good faith in reliance upon and in accordance with the advice of such counsel shall be full justification for any such act or omission and the Board of Managers shall be fully protected in so acting or omitting to act.

11.8    <u>Devotion of Time; Exclusivity</u>.    Feinberg and/or his successors in interest shall not be obligated to devote all of their time or business efforts to the affairs of the Company, but shall only devote such time as he (or if applicable, the Successor Manager) deems appropriate in his or her sole discretion. Hunter Lipton must devote at least eighty percent (80%) of his working time to the affairs of the Company. A Manager and its affiliates may conduct any business or activity whatsoever without any accountability to the Company or to any other Member.    Each Member understands that the Managers and their affiliates may be interested, directly or indirectly, in various other businesses and undertakings. Each Member understands and acknowledges that the conduct of the business of the Company may directly or indirectly involve business dealings with such other businesses or undertakings of the Managers and their affiliates. The creation of the Company and the assumption by a Manager of its duties hereunder shall be without prejudice to the respective rights of the Manager and its affiliates to maintain such other interests and activities and to receive and enjoy profits or compensation therefrom, and each Member waives any rights he might otherwise have to share or participate in such other interests or activities of the Managers and their affiliates.

11.9   Compensation; Administrative Expenses.   The Board of Managers shall not be entitled to receive compensation for services rendered by him or her in the management of the Company's business; each officer of the Company shall be compensated in such manner as Feinberg shall reasonably determine.   The Company shall provide the Board of Managers with (or, at a Manager's election, reimburse a Manager for) reasonable office space, personnel, equipment, supplies and other administrative and management support that may be necessary or appropriate in connection with the operation of the business of the Company.

11.10   Limited Liability.   Neither any Manager (including the Successor Manager) nor any officer shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Manager or an officer.   No Manager (including the Successor Manager) or officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, regardless of the legal theory advanced except for any liability for losses, claims, damages or expenses incurred by the Company which are finally judicially determined to have resulted primarily from the willful misconduct or gross negligence of the Manager or officer.

11.11   Limitation on Members' Authority.   No Member shall be an agent of the Company solely by virtue of being a Member; and no Member shall have authority to act for or on behalf of the Company solely by virtue of being a Member, except as may be otherwise expressly provided in this Agreement.

11.12   Actions Requiring Feinberg.   Except as specifically authorized by this Agreement, the Company shall obtain the affirmative vote or written consent of Feinberg prior to engaging in any of the following matters:

(a)   The authorization or issuance of any new or existing class or classes or series of capital units of the Company having any preference or priority as to distributions of assets or redemption superior to any such preference or priority of the Units; or

(b)   Any voluntary dissolution, liquidation or winding-up of the Company or other discontinuance of the business of the Company; or

(c)   The repurchase or redemption of Units by the Company;

(d)   Disposing of or acquiring any interest in any corporation or business (whether by purchase or assets, purchase of stock, merger or otherwise), enter into any joint venture or make any investment involving consideration in the amount of $100,000 or more;

(e)   Entering into a material transaction or series of transactions outside the ordinary course of business with any Members, Manager, officer, consultant, agent, advisor, employee, representative or Affiliate of the Company;

(f)   Any agreement by the Company or its Members regarding any Change in Control transaction; and

16

(g)    unless otherwise provided by law, any other decisions which are to be made by the Members, rather than the Managers.

## ARTICLE 12
## TRANSFER OF INTEREST

12.1    Transfer Restrictions.  Except for Feinberg, no Member may transfer any of their Interest to any Person who is not a Member other than in compliance with the terms and conditions of this Article 12.  Notwithstanding the aforesaid, no Member may transfer any of their Interest without the consent of Feinberg. Either Feinberg or Gotham Enterprises & Affiliates, LLC may transfer any and/or all of their respective Interests without the consent and/or the approval of any of the other Members and/or Managers. Any attempted transfer of any Interest that is made other than in compliance with the terms and conditions of this Article 12 shall be invalid and shall not be reflected on the Company's books.

12.2    Permitted Transfers.  Subject to the conditions and restrictions set forth in this Section 12.2 and Section 16.18, a Member may at any time transfer all or any portion of its Interests to (a) any other Member, (b) members of such Member's immediate family or a trust for the benefit of such immediate family members for estate planning purposes, or pursuant to a Last Will and Testament and/or Feinberg and/or Gotham Enterprises & Affiliates, LLC as set forth in Section 12.1 of this Agreement, (c)  with respect only to Feinberg Gotham Enterprises & Affiliates, LLC  as provided in Section 14.1 herein or (d) any Person that is an Affiliate of such Member, or (d) any Person, with the approval and/or consent of Feinberg (any such Transfer in subparts "a" through "d" shall be a "***Permitted Transfer***"); *provided, however,* that a transferee pursuant to subpart "(b)" shall have only the right to the distributions, Profits and Losses otherwise allocable to the Member's Interest, as a holder of an Interest, shall have no right to become a substituted Member except as provided in Article 14 below, and shall have no right to the management of the Company or to participate in any decision affecting the Company.  A Transfer of Interests shall not be treated as a Permitted Transfer unless and until all of the following conditions are satisfied:

12.2.1  Except in the case of a transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be reasonably necessary or appropriate in the opinion of counsel to the Company to effect such transfer.  In the case of a transfer of Interests involuntarily by operation of law, the transfer shall be confirmed by the presentation to the Company of legal evidence of such transfer, in form and substance satisfactory to counsel to the Company.  In all cases, the transferor and/or transferee shall reimburse the Company for all costs and expenses that the Company reasonably incurs in connection with the transfer.

12.2.3  The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number and any other information reasonably necessary to permit the Company to file all required state and federal tax returns and other legally required information statements or returns.  Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Interests until it has received such information.

17

12.3.4 Except in the case of a transfer of Interests involuntarily by operation of law, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Board of Managers, to the effect that such transfer is exempt from all applicable registration requirements and that such transfer will not violate any applicable laws regulating the transfer of securities.

12.2. 5 Any proposed transferee referred to throughout Section 12 and any subsections thereunder shall (i) in connection with affecting any such transfer, be required to become a party to this Agreement, and (ii) have only the right to the distributions, Profits and Losses otherwise allocable to the transferor's Interest and shall have no right to become a substituted Member except as provided in Article 14 below, and shall have no right to the management of the Company or to participate in any decision affecting the Company.

12.3  Mandatory Co-Sale.

12.3. 1 Right of Mandatory Co-Sale.  Herbert Feinberg and/or his estate if they are still a Member and if not, Members holding Units representing more than fifty percent (50%) of the Percentage Interests in the Company (the "***Selling Members***") who propose to sell all of their respective Interests in a bona fide sale to an unrelated third party shall have the right (the "***Mandatory Co-Sale Right***") to require each of the other Members to sell, or to cause to be sold, all of the Interests owned by such other Members upon the Offered Terms and Conditions (as defined below).  The Selling Members shall deliver a written notice of the proposed transfer (the "***Transfer Notice***") to the Board of Managers and to all other Members.  The Transfer Notice shall contain a description of the proposed transaction and the terms thereof, including a description of the Interests, the name of the proposed transferee, the price at which the Interests are to be sold and the terms of payment and the other terms and conditions to the proposed sale (the "***Offered Terms and Conditions***")

12.3.2 Participation in Mandatory Co-Sale.  At the closing of the transfer, the other Members who have received notice of the exercise of the Mandatory Co-Sale Right must provide for sale to the transferee, free and clear of all liens and rights of third parties, the Interests which the other Member has been notified are subject to the Mandatory Co-Sale Right; provided, however, that no Member shall be required to so transfer its Interests if it will receive less than fair market value for its Interests, relative to the other Interests being transferred and their relative right to participate in distributions of assets by the Company.  The other Members agree to make such representations and warranties regarding the Company and its subsidiaries and their respective ownership of Interests as the Selling Members may be required to make to the transferee, *provided*, such representations and warranties shall be reasonably acceptable to the other Members and *provided, further*, that each of the other Members' respective liabilities for breach of such representations and warranties shall be limited to such other Members' proceeds of the sale of their respective Interests pursuant to the Mandatory Co-Sale Right, and *provided, further*, that if any such other Member is not involved in the business of the Company, any representations or warranties that such other Member is required to make to the transferee with respect to the business of the Company shall be limited to the best knowledge of such other Member.

18

## ARTICLE 13
## DISSOLUTION OF THE COMPANY

13.1    <u>Events of Dissolution</u>.   The Company shall be dissolved on the earlier of the following events:

13.1.1  The decision to dissolve by Feinberg and a Majority of the Class A Members; or

13.1.2  The sale or liquidation of substantially all the assets of the Company.

13.2    <u>Perpetual Existence</u>.    The death, withdrawal, insanity, incompetency or bankruptcy of a Member shall not cause the Company to be dissolved.  Notwithstanding any other provision in the Act, the Company shall dissolve only upon the occurrence of one of the events set forth in <u>Section 13.1</u>.

13.3    <u>Application of Proceeds</u>.   The assets of the Company on winding-up shall be applied first to the expenses of the winding-up, liquidation and dissolution, then to creditors, in order of priority as provided by law, and thereafter distributed to the Members as provided in <u>Section 8.1</u>.

13.4    <u>Negative Capital Accounts</u>.   If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

13.5    <u>No Liability</u>.   No Member shall be personally liable for any debts, liabilities or obligations of the Company, whether to the Company, any Member or to the creditors of the Company, beyond the amount contributed by such Member to the capital of the Company, such Member's share of the accumulated but undistributed Profits of the Company, if any, and the amount of any distribution (including the return of any capital contribution) made to such Member required to be returned to the Company pursuant to the Act.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and for the return of its capital contribution and shall have no recourse therefore against any other Member. The Members shall not have any right to demand or receive property other than cash upon dissolution and termination of the Company or to demand the return of their capital contributions to the Company prior to dissolution and termination of the Company.

**ARTICLE 14**
**ADMISSION OF NEW MEMBERS; AMENDMENT**
**OF OPERATING AGREEMENT AND**
**CERTIFICATE OF FORMATION**

14.1    <u>Admission of Members</u>.  New Members may be admitted to the Company only upon the written approval of Feinberg and a Majority of the Class A Members and shall be admitted upon such terms and conditions as Feinberg and a Majority of the Class A Members may  from time to time determine, consistent with this Agreement, the Company's Certificate of Formation and any applicable provision of law or rule of a governmental agency or self-regulating organization which has jurisdiction over the business of the Company.  For purposes of clarity, subject to <u>Section 11.3</u>  and <u>Section 11.12(a)</u>, Feinberg is expressly authorized to determine and alter the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series.  Notwithstanding anything to the contrary contained herein, Feinberg, in his sole discretion, may admit and /or make transfers to any person, trust, entity, new  Members and/or existing Members with respect to the transfer of any and/or all of his Interest and/or the Interest and/or the Interest of Gotham Enterprises & Affiliates,  LLC without the consent and/or approval of any of the other Members and/or Managers. The aforesaid includes but is not limited to estate planning and/or testamentary transfers by Feinberg including but not limited by operation of law.

14.2    <u>Amendments</u>.  This Agreement and the Certificate of Formation may not be amended in whole or in part except upon the approval of Feinberg and the Majority of the Class A Members.  Subject to the provisions of <u>Section 11.3</u>, Feinberg may amend this Agreement without any vote, consent, approval, authorization or other action of any Member (provided that notice of such amendment is given to all Members) to (a) subject to Section <u>11.12(a)</u>, designate the rights, preferences, privileges and restrictions granted to and imposed upon any new Members or any Units representing any class or series thereof, and to fix the number of Units of any such class or series; or (b) reflect (i) the withdrawal, addition or substitution of Members, and (ii) the issuance of additional Units.  Notwithstanding the foregoing, a majority in interest of the members holding any class of Units must consent to any amendment of this Agreement that would materially adversely affect such class in a manner that is disproportionate from any other class.

**ARTICLE 15**
**LIABILITY AND INDEMNIFICATION**

15.1    <u>Limitation on Liability</u>.  No Member, whether in its capacity as a Member, Manager, employee or agent of the Company, shall be liable to the Company or any other Member for any expenses, damages or losses arising out of the performance of its duties for the Company other than those expenses, damages or losses directly attributable to such Person not acting in good faith and in a manner that he, she or it reasonably believed to be in or not opposed to the best interests of the Company or attributable to such Person's breach of his and her duty of loyalty to the Company.

15.2    Indemnification.  The Company shall indemnify any Member who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including, without limitation, an action by or in the right of the Company or by any Member) by reason of the fact that he, she or it is or was a Member, Manager, employee or agent of the Company against expenses (including attorneys' fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding to the fullest extent permitted under Delaware law.

## ARTICLE 16
## MISCELLANEOUS

16.1    Entire Agreement.  Except as herein provided, this Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  It supersedes any prior agreement or understandings between them relating to the subject matter hereof, and it may not be modified or amended in any manner other than as set forth herein.

16.2    Governing Law and Venue.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware, notwithstanding the conflicts of law principles thereof.  All terms used herein shall have the meaning given them under the Act, as such may be amended from time to time, except as otherwise provided herein.  Each Member hereby consents to the jurisdiction of the state and federal courts sitting in the State of Delaware in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.  Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 16.14, and that when so made shall be as if served upon him or her personally within the State of Delaware.

16.3    Binding Agreement.  Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns.

16.4    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the Person may require in the context thereof.

16.5    Validity.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application of such provision to any Person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

16.6    Due Authorization. Each Person executing this Agreement on behalf of an entity represents and warrants that he or she has been duly authorized to enter into this Agreement on behalf of such entity, and that such entity is thereby fully bound.

16.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel.

16.8    Confidentiality.  The terms of this Agreement, the identity of any person with whom the Company may be holding discussions with respect to any license, intellectual property enforcement, investment, acquisition, disposition or other transaction, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company or the relative or absolute rights or interests of any of the Members (collectively, the "**Confidential Information**") that is not already publicly available or that has not been publicly disclosed pursuant to authorization by all of the Members or the Board of Managers is confidential and proprietary information of the Company, the disclosure of which would cause irreparable harm to the Company and the Members.  Accordingly, each Member represents that it has not and agrees that it will not and will direct its Affiliates that to such Member's knowledge acquire any such Confidential Information not to, disclose to any Person any Confidential Information or confirm any statement made by third Persons regarding Confidential Information until the Company has publicly disclosed the Confidential Information pursuant to authorization by the Board of Managers and has notified each Member that it has done so. Notwithstanding the foregoing, any Member (or its Affiliates) may disclose such Confidential Information if required by law (it being specifically understood and agreed that anything set forth in a registration statement or any other document filed pursuant to law will be deemed required by law), or otherwise required or requested by any governmental authority having jurisdiction over such Member or its Affiliates.  In addition, any Member (or its Affiliates) may disclose such Confidential Information to any person or entity (including, without limitation, to any actual or prospective lender of the Company, their servicers, participants or advisors or as otherwise provided in any loan documentation binding on the Company) to the extent reasonably necessary for it to perform any of its duties or obligations hereunder and to its attorneys and advisors who are directed to maintain a similar confidence. The covenants contained in this Section 16.8 shall survive the transfer of the Interest of any Member and the termination of the Company.

16.9    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application of such provision to any Person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

16.10   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.11   Attorney's Fees.  In the event of any litigation or arbitration between the parties hereto respecting or arising out of this Agreement, the prevailing party, whether or not such litigation or arbitration proceeds to final judgment or determination, shall be entitled to recover all of the reasonable attorney's fees incurred with respect to such legal efforts, in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom; *provided, however,* that in the case of any negotiated settlement of any litigation or arbitration between the parties, there shall be no "prevailing party" for purposes of this section.  As used

herein, the term "attorney's fees" shall be deemed to mean the reasonable cost of any legal services actually performed in connection with the matters involved, calculated on the basis of usual fees charged by the attorneys performing such services.

16.12  <u>Representation by Counsel</u>.  Each party hereto represents and agrees with each other that it has been represented by or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired, it availed itself of this right and opportunity, that it or its authorized officers (as the case may be) have carefully read and fully understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence.  The parties to this Agreement participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof will arise favoring or disfavoring any party to this Agreement by virtue of the authorship of any of the provisions of this Agreement.

16.13  <u>Legal Representation of the Company</u>.  **THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR ANY OF THE MEMBERS MAY ALSO PERFORM SERVICES FOR THE COMPANY.  TO THE EXTENT THE FOREGOING REPRESENTATION CONSTITUTES A CONFLICT OF INTEREST, EACH MEMBER HEREBY EXPRESSLY WAIVES ANY SUCH CONFLICT OF INTEREST. THE MEMBERS FURTHER ACKNOWLEDGE THAT THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR THE COMPANY (AND/OR ANY MEMBER) SHALL NOT BE DEEMED BY VIRTUE OF SUCH REPRESENTATION TO HAVE ALSO REPRESENTED ANY MEMBER (OR THE COMPANY OR THE OTHER MEMBERS IN THE CASE OF THE REPRESENTATION OF A MEMBER) IN CONNECTION WITH ANY SUCH MATTERS.**

16.14  <u>Notices</u>.  Except as otherwise set forth in this Agreement, all notices or other communications required or permitted hereunder shall be in writing, and shall be delivered or sent, as the case may be, by any of the following methods: (i) personal delivery; (ii) overnight commercial carrier; (iii) registered or certified mail, postage prepaid, return receipt requested; or (iv) facsimile.  Any such notice or other communication shall be deemed received and effective upon the earlier of (i) if personally delivered, the date of delivery to the address of the person to receive such notice; (ii) if delivered by overnight commercial carrier, two (2) days following the receipt of such communication by such carrier from the sender, as shown on the sender's delivery invoice from such carrier; (iii) if mailed, on the date of delivery as shown by the sender's registry or certification receipt; or (iv) if given by facsimile, when received.  Any notice or other communication sent by facsimile must be confirmed within forty-eight (48) hours by letter mailed or delivered in accordance with the foregoing.  Any reference herein to the date of receipt, delivery, or giving, or effective date, as the case may be, of any notice or communication shall refer to the date such communication becomes effective under the terms of this <u>Section 16.14</u>.  Any such notice or other communication so delivered shall be addressed to the party to

be served at the address for such party set forth in <u>Schedule A</u>. Such addresses may be changed by giving written notice to the other parties in the manner set forth in this <u>Section 16.14</u>. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of notice or other communication sent.

16.15   <u>Investment Representation</u>. Each Member hereby represents and warrants to and agrees with the other Members and the Company that he or she is acquiring the Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Interest.   Each Member hereby represents and warrants to and agrees with the other Members and the Company that he or she is financially able to bear the economic risk of an investment in the Interest, including the total loss thereof.   Each Member has either (i) a preexisting personal or business relationship with a Manager and the Company, or (ii) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in the Interests and of protecting the Member's own interests in connection with this investment.   Each Member hereby represents and warrants to and agrees with the other Members and the Company that such Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Interest.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above:

**MEMBERS:**

**CLASS A MEMBERS:**

Herbert Feinberg

GOTHAM ENTERPRISES & AFFILIATES, LLC

By: _____

Herbert Feinberg Title: Managing Member

**CLASS A-1 MEMBERS: ***

Hunter Lipton

**CLASS C MEMBERS: ***

Harvey Berg

David Leone

TANNER CANYON II TRUST

By: _____

David Leone, Trustee

Ed Hines

* The signatures of those other than Herbert Feinberg and/or the Class A Members are expressly to evidence their agreement to the terms contained herein, and their consent as to any other matter is not required and the signatures of the Members other than Herbert Feinberg and the Class A Members hereto is not deemed as a waiver or acknowledgement that their consent is otherwise required for any matter.

25

## SCHEDULE A

## MDF HOLDINGS, LLC MEMBERS (To be effective as of January 1, 2013)

**Authorized Units:** Class A Units: 510,000 (Voting); Class A-1 Units: 250,000 (Non-Voting); Class B Units: 145,000 (Non-Voting); Class C Units: 95,000 (Non-Voting)

| Member Name & Address | Number of Units | Percentage Interests |
|---|---|---|
| **CLASS A MEMBERS** | | |
| Herb Feinberg | 110,000 | 11% |
| Gotham Enterprises & Affiliates, LLC | 400,000 | 40% |
| Class A Subtotal: | **510,000 Units** | **51%** |
| | | |
| **CLASS A-1 MEMBERS** | | |
| Hunter Lipton | 250,000 | 25% |
| Class A-1 Subtotal: | **250,000 Units** | **25%** |
| | | |
| **CLASS B MEMBERS** | | |
| Reserved but Unissued Profits Interests | 145,000 | 14.5% |
| Class B Subtotal: | **145,000 Units** | **15.5%** |
| | | |
| **CLASS C MEMBERS** | | |
| Harvey Berg | 25,000 | 2.5% |
| David Leone | 25,000 | 2.5% |
| Tanner Canyon II Trust | 25,000 | 2.5% |
| Ed Hines | 20,000 | 2.0% |
| Class C Subtotal: | **95,000 Units** | **9.5%** |
| | | |
| **TOTAL** | **1,000,000 Units** | **100%** |

26

## SCHEDULE A

## MDF HOLDINGS, LLC MEMBERS (To be effective as of January 1, 2013)

**Authorized Units:** Class A Units: 510,000 (Voting); Class A-1 Units: 250,000 (Non-Voting); Class B Units: 145,000 (Non-Voting); Class C Units: 95,000 (Non-Voting)

| Member Name & Address | Number of Units | Percentage Interests |
|---|---|---|
| **CLASS A MEMBERS** | | |
| Herb Feinberg | 110,000 | 11% |
| Gotham Enterprises & Affiliates, LLC | 400,000 | 40% |
| **Class A Subtotal:** | **510,000 Units** | **51%** |
| | | |
| **CLASS A-1 MEMBERS** | | |
| Hunter Lipton | 250,000 | 25% |
| **Class A-1 Subtotal:** | **250,000 Units** | **25%** |
| | | |
| **CLASS B MEMBERS** | | |
| Reserved but Unissued Profits Interests | 145,000 | 14.5% |
| **Class B Subtotal:** | **145,000 Units** | **15.5%** |
| | | |
| **CLASS C MEMBERS** | | |
| Harvey Berg | 25,000 | 2.5% |
| David Leone | 25,000 | 2.5% |
| Tanner Canyon II Trust | 25,000 | 2.5% |
| Ed Hines | 20,000 | 2.0% |
| **Class C Subtotal:** | **95,000 Units** | **9.5%** |
| | | |
| **TOTAL** | **1,000,000 Units** | **100%** |



26

## SCHEDULE A

## MDF HOLDINGS, LLC MEMBERS (To be effective as of January 1, 2013)

**Authorized Units:** Class A Units: 510,000 (Voting); Class A-1 Units: 250,000 (Non-Voting); Class B Units: 145,000 (Non-Voting); Class C Units: 95,000 (Non-Voting)

| Member Name & Address | Number of Units | Percentage Interests |
|---|---|---|
| **CLASS A MEMBERS** | | |
| Herb Feinberg | 110,000 | 11% |
| Gotham Enterprises & Affiliates, LLC | 400,000 | 40% |
| **Class A Subtotal:** | **510,000 Units** | **51%** |
| | | |
| **CLASS A-1 MEMBERS** | | |
| Hunter Lipton | 250,000 | 25% |
| **Class A-1 Subtotal:** | **250,000 Units** | **25%** |
| | | |
| **CLASS B MEMBERS** | | |
| Reserved but Unissued Profits Interests | 145,000 | 14.5% |
| **Class B Subtotal:** | **145,000 Units** | **15.5%** |
| | | |
| **CLASS C MEMBERS** | | |
| Harvey Berg | 25,000 | 2.5% |
| David Leone | 25,000 | 2.5% |
| Tanner Canyon II Trust | 25,000 | 2.5% |
| Ed Hines | 20,000 | 2.0% |
| **Class C Subtotal:** | **95,000 Units** | **9.5%** |
| | | |
| **TOTAL** | **1,000,000 Units** | **100%** |

26





## SCHEDULE A

## MDF HOLDINGS, LLC MEMBERS (To be effective as of January 1, 2013)

**Authorized Units:** Class A Units: 510,000 (Voting); Class A-1 Units: 250,000 (Non-Voting); Class B Units: 145,000 (Non-Voting); Class C Units: 95,000 (Non-Voting)

| Member<br>Name & Address | Number of Units | Percentage Interests |
|---|---|---|
| **CLASS A MEMBERS** | | |
| Herb Feinberg | 110,000 | 11% |
| Gotham Enterprises & Affiliates, LLC | 400,000 | 40% |
| **Class A Subtotal:** | **510,000 Units** | **51%** |
| | | |
| **CLASS A-1 MEMBERS** | | |
| Hunter Lipton | 250,000 | 25% |
| **Class A-1 Subtotal:** | **250,000 Units** | **25%** |
| | | |
| **CLASS B MEMBERS** | | |
| Reserved but Unissued Profits Interests | 145,000 | 14.5% |
| **Class B Subtotal:** | **145,000 Units** | **15.5%** |
| | | |
| **CLASS C MEMBERS** | | |
| Harvey Berg | 25,000 | 2.5% |
| David Leone | 25,000 | 2.5% |
| Tanner Canyon II Trust | 25,000 | 2.5% |
| Ed Hines | 20,000 | 2.0% |
| **Class C Subtotal:** | **95,000 Units** | **9.5%** |
| | | |
| **TOTAL** | **1,000,000 Units** | **100%** |

26

**EXHIBIT A**
**FORM OF UNIT CERTIFICATE**

No. LLC-

_____ [Class A/A-1/B/C] Units

**MDF HOLDINGS, LLC**
**a Delaware limited liability company**

INTEREST UNIT CERTIFICATE

**THE UNITS REPRESENTING THE INTERESTS EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO MATERIAL RESTRICTIONS UNDER THAT CERTAIN OPERATING AGREEMENT, DATED AS OF [--], 2011, BY AND AMONG THE PERSONS IDENTIFIED THEREIN, AS THE SAME MAY BE AMENDED FROM TIME TO TIME (THE "OPERATING AGREEMENT").  A COPY OF THE OPERATING AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE BY MDF HOLDINGS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, TO THE HOLDER HEREOF UPON SUCH HOLDER'S WRITTEN REQUEST.**

**THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED, ASSIGNED, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH THE ACT AND THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION THEREUNDER.**

This certifies that | _____ ] is the registered holder (the "**Holder**") of [_____] [Class A/A-1/B/C] Units representing Interests in MDF HOLDINGS, LLC, a limited liability company organized under the laws of the State of Delaware (the "**Company**").

The rights, preferences, privileges, and restrictions of the Units, representing Interests of the Company, are set forth in the Operating Agreement.  The rights, preferences, privileges and restrictions set forth in the Operating Agreement are incorporated herein by this reference and made a part hereof and reference is made to that agreement for a full description of the rights, preferences, privileges and restrictions of the Units, including without limitation, the extent to which the Holder's Percentage Interest represented by this Certificate may be diluted by further investment in the Company. **From and after the date of this Certificate, the Percentage Interest represented by the Units held by Holder may be diluted by further investment in the Company to the extent set forth in the Operating Agreement.** Copies of the Operating Agreement will be provided without charge by the Company to the Holder hereof upon such Holder's written request.

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by a duly authorized Manager as of the [___] day of _____, 2011.

_____

Hunter Lipton, Associate Manager

27

# EXHIBIT "B"

Assignment and Bill of Sale

(Estate's Interest in MDF)

## ASSIGNMENT SEPARATE FROM CERTIFICATE
## (BILL OF SALE)

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Chapter 7 Trustee Shelley D. Krohn ("Assignor"), in connection with Chapter 7 Bankruptcy Case pending in the United States Bankruptcy Court, District of Nevada, as Bankruptcy Case No. BK-S-19-13898-ABL (the "*Bankruptcy Estate*"), hereby transfers and assigns to HERB FEINBERG or his assigns to be designated by Feinberg ("Assignee") 100% of the Estate's right, title and interest in MDF HOLDINGS, LLC, a Delaware limited liability company ("MDF"), including, but not limited to, the Estate's 29.24% interest in the form of 250,000 Class A-1 non-voting units in MDF in their entirety held in the name of Hunter Lipton, and any rights to unissued membership units in MDF (collectively, the "Units"), separate from certificate, including any and all rights and obligations arising thereunder, including, but not limited to, any pre- or post-petition rights to an accounting, income distributions, net profits, capital contributions, capital accounts, elections, management, or compensation, as governed under the Operating Agreement, and any amendments thereto. Assignor represents and warrants to Assignee that the Bankruptcy Estate is the sole owner of the Units in MDF held in the name of the Debtor, including the rights to any unissued membership units in MDF; that the Units being assigned are solely owned by the Bankruptcy Estate free and clear of all pledges, liens, hypothecation and encumbrances; that Assignor has full power and authority to transfer 100% of the Estate's right, title and interest in MDF, including, but not limited to, 29.24% of the total issued and outstanding units in MDF and any rights to unissued membership units in MDF, to Assignee.

Effective:  April ___, 2020

**ASSIGNOR**:

The Bankruptcy Estate of Hunter Lipton,
Nevada Bankruptcy Case
No. BK-S-19-13898-ABL

By: _____
    Shelley D. Krohn,
    Trustee

**ACCEPTED:**

**HERBERT FEINBERG:**

By:_____

Printed Name:_____

**ACKNOWLEDGED AND AGREED:**

By: _____
    Herbert Feinberg

# EXHIBIT "C"

Grant, Bargain and Sale Deed (NY Apartment)

**Form 3290**
Standard N.Y.B.T.U. Form 8002 - Bargain and Sale Deed
With Covenant against Grantor's Acts

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

**THIS INDENTURE**, made as of the 3rd day of April, Two Thousand Twenty
**BETWEEN**

**THE BANKRUPTCY ESTATE OF HUNTER LIPTON, Nevada Bankruptcy Case No. BK-S-19-13898-ABL, by and through the bankruptcy court appointed Chapter 7 Trustee, Shelley D. Krohn, having a business address of 510 South 8th Street, Las Vegas, Nevada 89101 and Tara Gordon Lipton**, having an address at 255 E. 74th Street, Unit 3A, New York, NY 10021

party of the first part, and

**Tara Gordon Lipton,** having an address at 255 E. 74th Street, Unit 3A, New York, NY 10021

party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of ten ($10.00) dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the SEE ATTACHED SCHEDULE (A) FOR LEGAL DESCRIPTION; SEE ATTACHED SCHEDULE (B) FOR BANKRUPTCY COURT ORDER.

       **THIS PREMISES IS INTENDED FOR RESIDENTIAL USE.**

       **PREMISES KNOWN** AS 255 E. 74th Street, Unit 3A, New York, NY 10021

       **THE PREMISES BEING conveyed by the party of the first part are the same premises that were acquired by deed from Casa 74TH DEVELOPMENT LLC dated March 18, 2009 and recorded March 27, 2009 in the Office of the City Register of the City of New York, CRFN: 2009000089398.**

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.  The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.
IN PRESENCE OF:

                                  THE BANKRUPTCY ESTATE OF
                                  HUNTER LIPTON, Nevada Bankruptcy
                                  Case No. BK-S-19-13898-ABL

                          _____

                          **Shelley D. Krohn, Trustee**

                          _____

                          **Tara Gordon Lipton**

110821394.1

<u>TO BE USED ONLY WHEN ACKNOWLEDGMENT IS MADE IN NEW YORK</u>

State of New York, County of _____ ss:

On the _____ day of _____ in the year 2020
before me, the undersigned, personally appeared

**Tara Gordon Lipton**
personally known to me or proved to me on the basis of
satisfactory evidence to be the individuals whose names
are subscribed to the within instrument and
acknowledged to be that they executed the same in
his/their capacities, and that by their signatures on
the instrument, the individuals, or the person upon
behalf of which the individuals acted, executed the
instrument.

_____
(signature and office of individual taking
acknowledgment)

State of New York, County of _____ ss:

On the _____ day of _____ in the year 2020
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of
satisfactory evidence to be the individual(s) whose
name(s) is (are) subscribed to the within instrument and
acknowledged to be that he/she/they executed the same
in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted,
executed the instrument.

_____
(signature and office of individual taking
acknowledgment)

State of Nevada                    )
                                   )ss.:
County of                          )

On the _____ day of _____ in the year 2020 before me, the undersigned, personally
appeared **Shelley D. Krohn,** personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by
his/her signature(s) on the instrument, the individual(s), or the person upon behalf of which the
individual(s) acted, executed the instrument and that such individual(s) made such appearance before
the undersigned in the city of _____, State of Nevada.

_____
Notary Public

# Bargain and Sale Deed
#### With Covenants against Grantor's Acts

Title No.

SECTION            *
BLOCK              *1429
LOT                *1104
COUNTY OR TOWN     *New York

RECORD AND RETURN BY MAIL TO:

| **Hunter Lipton and Tara Gordon Lipton** | Friedberg Pinkas PLLC |
| TO | Charles R. Stark, Esq. |
| **Tara Gordon Lipton** | 767 Third Avenue, 31st Floor |
| | New York, NY 10017 |

110821394.1

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## FOR ONE- AND TWO-FAMILY DWELLINGS

**State of New York**

}   **SS.:**

**County of**

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

<u>255 EAST 74TH STREET</u> , <u>3A</u> ,

Street Address Unit/Apt.

<u>MANHATTAN</u>     New York,    <u>1429</u>    <u>1104</u>   (the "Premises");

Borough                                    Block          Lot

That the Premises is a one or two family dwelling, or  a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

| | |
|---|---|
| Name of Grantor (Type or Print) | Name of Grantee (Type or Print) |
| Signature of Grantor | Signature of Grantee |

Sworn to before me                          Sworn to before me

this _____ day of _____ 20 _____   this _____ day of _____ 20 _____

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**



**The City of New York**
**Department of Environmental Protection**
**Bureau of Customer Services**
**59-17 Junction Boulevard**
**Flushing, NY   11373-5108**

## Customer Registration Form for Water and Sewer Billing

### Property and Owner Information:

(1)     Property receiving service:  BOROUGH:  **MANHATTAN**                    BLOCK:  **1429**              LOT:  **1104**

(2)     Property  Address:  **255  EAST 74TH STREET   Unit 3A, NEW YORK, NY 10021**

(3)     Owner's Name:           **LIPTON , TARA GORDON**

          Additional Name:

### Affirmation:

  Your water & sewer bills will be sent to the property address shown above.

### Customer Billing Information:

#### Please Note:

**A.**  Water and sewer charges are the legal responsibility of the owner of a property receiving water and/or sewer service. The owner's responsibility to pay such charges is not affected by any lease, license or other arrangement, or any assignment of responsibility for payment of such charges. Water and sewer charges constitute a lien on the property until paid. In addition to legal action against the owner, a failure to pay such charges when due may result in foreclosure of the lien by the City of New York, the property being placed in a lien sale by the City or Service Termination.

**B.**  Original bills for water and/or sewer service will be mailed to the owner, **at the property address or to an alternate mailing address**. DEP will provide a duplicate copy of bills to one other party (such as a managing agent), however, any failure or delay by DEP in providing duplicate copies of bills shall in no way  relieve the owner from his/her liability to pay all outstanding water and sewer charges. Contact DEP at (718) 595-7000 during business hours or visit www.nyc.gov/dep to provide us with the other party's information.

### Owner's Approval:

The undersigned certifies that he/she/it is the owner of the property receiving service referenced above; that he/she/it has read and understands Paragraphs A & B under the section captioned "Customer Billing Information"; and that the information supplied by the undersigned on this form is true and complete to the best of his/her/its knowledge.

Print Name of Owner:

Signature: _____Date (mm/dd/yyyy)

Name and Title of Person Signing for Owner, if applicable:

BCS-7CRF-ACRIS   REV. 8/08

2020032400151101



**THE CITY OF NEW YORK**
**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

**AFFIDAVIT IN LIEU OF REGISTRATION STATEMENT**

Department of
Housing Preservation
& Development
nyc.gov/hpd

County of _____ ) SS.:

State of New York                )
_____TARA GORDON  LIPTON_____, being duly sworn, deposes and says:

1) I am personally familiar with the real property known by the street address of (insert street address):
   _____255 EAST 74TH STREET 3A_____Block____1429____, Lot____1104____,
   and make this Affidavit as (describe capacity in which affidavit is made) _____GRANTEE_____
   in connection with a ~~deed/lease/memorandum of lease~~  (delete inapplicable description) which transfers an
   interest in the above real property, that is dated _____4/3/2020_____, and is
   between__THE BANKRUPTCY ESTATE OF__ and_____TARA GORDON LIPTON_____.
            HUNTER LIPTON

2) The statements made in the Affidavit are true of my own knowledge, and I submit this Affidavit in order
   that this Instrument be accepted for recording without being accompanied by a registration statement, as
   such is defined by Article 2 of Subchapter 4 of Chapter 2 of Title 27 of the Administrative Code of the
   City of New York.

3) Exemption from registration is claimed because the Instrument affects neither (a) an entire multiple
   dwelling as such is defined by §27-2004(a)(7) of Article 1 of Subchapter 1, of Chapter 2 of Title 27 of the
   Administrative Code of the City of New York and New York State Multiple Dwelling Law §4(7) nor (b)
   a private dwelling as such is defined by §27-2004 (a) (4) of Article 1 of Subchapter 1 of Chapter 2 of
   Title 27 of the Administrative Code of the City of New York and of the New York State Multiple
   Dwelling Law §4(6) that is required to register pursuant to, Article 2 of Subchapter 4 of Chapter 2 of Title
   27 of the Administrative Code of the City of New York. The Instrument does not affect a multiple
   dwelling because it affects the following (check applicable item):

   ☐ a commercial building
   ☐ a one-or two family dwelling whose owner or a family member resides in the dwelling
   ☑ a condominium unit in a multiple dwelling
   ☐ cooperative corporation shares relating to a single residential unit in a multiple dwelling
   ☐ mineral, gas, water, air or other similar rights not affecting a multiple dwelling
   ☐ lease of commercial space in a multiple dwelling
   ☐ vacant land

4) I am aware that this Affidavit is required by law to be submitted in order that the Instrument be recorded
   or accepted for recording without being accompanied by a registration statement.  I am aware that any
   false statements made in this Affidavit may be punishable as a felony or misdemeanor under Penal Law
   Article 210 or as an offense under Administrative Code of the City of New York §10-154.

Sworn To Before Me This                          _____
                                                                          Signature

                                                          770 LEXINGTON AVENUE
_____Day of _____                  7TH FLOOR
_____  Address  NEW YORK, NY 10065
         Notary Public                            Telephone # _____212-829-9090_____

♲ Printed on paper containing 30% post-consumer material.

2020032400151101

**Affidavit in Lieu of Registration Statement Additional Grantor(s) / Grantee(s)**           **Attachment**

**Property**
 255 EAST 74TH STREET 3A BLOCK:1429, Lot:1104

**Grantor(s)**

2          TARA  GORDON LIPTON



**NEW YORK CITY DEPARTMENT OF FINANCE**

# REAL PROPERTY TRANSFER TAX RETURN
### (Pursuant to Title 11, Chapter 21, NYC Administrative Code)

▲ DO NOT WRITE IN THIS SPACE ▲
FOR OFFICE USE ONLY

## GRANTOR

● Name   THE BANKRUPTCY ESTATE OF HUNTER LIPTON

SOCIAL SECURITY NUMBER

● Grantor is a(n): ☐ individual  ☐ partnership  ☐ corporation
(check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other
(see instructions)

Telephone Number

**OR**

EMPLOYER IDENTIFICATION NUMBER

● Permanent mailing address *after* transfer (number and street)   510 SOUTH 8TH STREET

● City and State                                                    Zip Code

SINGLE MEMBER EIN OR SSN

● Single member's name if grantor is a single member LLC

## GRANTEE

● Name   TARA GORDON  LIPTON

SOCIAL SECURITY NUMBER

● Grantee is a(n): ☐ individual  ☐ partnership  ☐ corporation
(check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other
(see instructions)

Telephone Number

**OR**

EMPLOYER IDENTIFICATION NUMBER

● Permanent mailing address *after* transfer (number and street)   255 E. 74TH STREET, UNIT 3A

● City and State                                                    Zip Code

SINGLE MEMBER EIN OR SSN

● Single member's name if grantee is a single member LLC

## PROPERTY LOCATION

LIST EACH LOT SEPARATELY. ATTACH A RIDER IF ADDITIONAL SPACE IS REQUIRED

| ● Address (number and street) | Apt. No. | Borough | Block | Lot | # of Floors | Square Feet | ● Assessed Value of Property |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

● DATE OF TRANSFER TO GRANTEE: _____   ● PERCENTAGE OF INTEREST TRANSFERRED: _____ %

## CONDITION OF TRANSFER.  See Instructions

● Check (✓) all of the conditions that apply and fill out the appropriate schedules of this return. Additionally, Schedules 1 and 2 **must** be completed for all transfers.

a. ☐ ..... Arms length transfer
b. ☐ ..... Transfer in exercise of option to purchase
c. ☐ ..... Transfer from cooperative sponsor to cooperative corporation
d. ☐ ..... Transfer by referee or receiver (complete Schedule A)
e. ☐ ..... Transfer pursuant to marital settlement agreement or divorce decree (complete Schedule I)
f. ☐ ..... Deed in lieu of foreclosure (complete Schedule C)
g. ☐ ..... Transfer pursuant to liquidation of an entity (complete Schedule D)
h. ☐ ..... Transfer from principal to agent, dummy, strawman or conduit or vice-versa (complete Schedule E)
i. ☐ ..... Transfer pursuant to trust agreement or will (attach a copy of trust agreement or will)
j. ☐ ..... Gift transfer not subject to indebtedness
k. ☐ ..... Gift transfer subject to indebtedness
l. ☐ ..... Transfer to a business entity in exchange for an interest in the business entity (complete Schedule F)
m. ☐ ..... Transfer to a governmental body
n. ☐ ..... Correction deed

o. ☐ ..... Transfer by or to a tax exempt organization (complete Schedule G)
p. ☐ ..... Transfer of property partly within and partly without NYC
q. ☐ ..... Transfer of successful bid pursuant to foreclosure
r. ☐ ..... Transfer by borrower solely as security for a debt or a transfer by lender solely to return such security
s. ☐ ..... Transfer wholly or partly exempt as a mere change of identity or form of ownership. Complete Schedule M)
t. ☐ ..... Transfer to a REIT or to a corporation or partnership controlled by a REIT. (Complete Schedule R)
u. ☐ ..... Other transfer in connection with financing (describe): _____
v. ☐ ..... A grant or assignment of a leasehold interest in a tax-free NY area
w. ☐ ..... Transfer to an HDFC or an entity controlled by an HDFC. (Complete Schedule L)
x. ........... Reserved
y. ........... Reserved
z. ☐ ..... Other (describe) _____

NYC-RPT - Rev. 0J.201J

| ● TYPE OF PROPERTY (✓) | ● TYPE OF INTEREST (✓) |
|---|---|

**TYPE OF PROPERTY (✓)**

- a. ☐ ......... 1-3 family house
- b. ☐ ......... Individual residential condominium unit
- c. ☐ ....... Individual cooperative apartment
- d. ☐ ....... Commercial condominium unit
- e. ☐ ....... Commercial cooperative
- f. ........ 4 family dwelling
- g. ☐ ....... Apartment building
- h. ☐ ....... Office building
- i. ☐ ....... Industrial building
- j. ☐ ....... Utility
- k. ☐ ..... OTHER (describe):_____

**TYPE OF INTEREST (✓)**

Check box at LEFT if you intend to record a document related to this transfer. Check box at RIGHT if you do not intend to record a document related to this transfer.

| | REC. | | NON REC. |
|---|---|---|---|
| a. | ☐ | Fee.............................................. | ☐ |
| b. | ☐ | Leasehold Grant ............................ | ☐ |
| c. | ☐ | Leasehold Assignment or Surrender ............... | ☐ |
| d. | ☐ | Easement ..................................... | ☐ |
| e. | ☐ | Subterranean Rights ......................... | ☐ |
| f. | ☐ | Development Rights .......................... | ☐ |
| g. | ☐ | Stock ......................................... | ☐ |
| h. | ☐ | Partnership Interest ......................... | ☐ |
| i. | ☐ | OTHER. (describe): ......................... | ☐ |

## SCHEDULE 1 - DETAILS OF CONSIDERATION

**COMPLETE THIS SCHEDULE FOR ALL TRANSFERS AFTER COMPLETING THE APPROPRIATE SCHEDULES ON PAGES 5 THROUGH 12.**
**ENTER "ZERO" ON LINE 11 IF THE TRANSFER REPORTED WAS WITHOUT CONSIDERATION.**

| | | | |
|---|---|---|---|
| 1. | Cash............................................................................................. ● | 1. | |
| 2. | Purchase money mortgage............................................................. ● | 2. | |
| 3. | Unpaid principal of pre-existing mortgage(s)...................................... ● | 3. | |
| 4. | Accrued interest on pre-existing mortgage(s)..................................... ● | 4. | |
| 5. | Accrued real estate taxes............................................................... ● | 5. | |
| 6. | Amounts of other liens on property................................................... ● | 6. | |
| 7. | Value of shares of stock or of partnership interest received.................. ● | 7. | |
| 8. | Value of real or personal property received in exchange...................... ● | 8. | |
| 9. | Amount of Real Property Transfer Tax and/or other taxes or expenses of the grantor which are paid by the grantee ● | 9. | |
| 10. | Other (describe):_____ ...● | 10. | |
| 11. | **TOTAL CONSIDERATION** (add lines 1 through 10 - must equal amount entered on line 1 of Schedule 2) (see instructions)........................................... ● | 11. $ | |

**See instructions for special rules relating to transfers of cooperative units, liquidations, marital settlements and transfers of property to a business entity in return for an interest in the entity.**

## SCHEDULE 2 - COMPUTATION OF TAX

| A. **Payment** | Pay amount shown on line 15 - *See Instructions* | Payment Enclosed |
|---|---|---|

| | | | |
|---|---|---|---|
| 1. | Total Consideration (from line 11, above)........................................... ● | 1. | |
| 2. | Excludable liens (see instructions).................................................... ● | 2. | |
| 3. | Consideration (line 1 less line 2)...................................................... ● | 3. | |
| 4. | Tax Rate (see instructions).............................................................. ● | 4. | % |
| 5. | HDFC Exemption (see Schedule L, line 15) ....................................... ● | 5. | |
| 6. | Consideration less HDFC Exemption (line 3 less line 5) ...................... ● | 6. | |
| 7. | Percentage change in beneficial ownership (see instructions) .............. ● | 7. | % |
| 8 | Taxable consideration (multiply line 6 by line 7).................................. ● | 8. | |
| 9. | Tax (multiply line 8 by line 4)........................................................... ● | 9. | |
| 10. | Credit (see instructions).................................................................. ● | 10. | |
| 11. | Transfer tax previously paid (see Schedule L, line 18)......................... ● | 11. | |
| 12. | Tax due (line 9 less line 10 and 11) (if the result is negative, enter zero)............ ● | 12. | |
| 13. | Interest (see instructions)................................................................ ● | 13. | |
| 14. | Penalty (see instructions)................................................................ ● | 14. | |
| 15. | **Total Tax Due** (add lines 12, 13 and 14)........................................... ● | 15. $ | |

Form NYC-RPT

## SCHEDULE 3 - TRANSFERS INVOLVING MULTIPLE GRANTORS AND/OR GRANTEES

**NOTE** If additional space is needed, attach copies of this schedule or an addendum listing all of the information required below.

## GRANTOR(S)

● Name TARA  GORDON LIPTON

● Grantor is a(n): ☐ individual  ☐ partnership      ☐ corporation   (check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other_____

Telephone Number

● Permanent mailing address *after* transfer (number and street)
255 E. 74TH STREET, UNIT 3A

● City and State                                     Zip Code

● Single member's name if grantor is a single member LLC

SOCIAL SECURITY NUMBER

OR

EMPLOYER IDENTIFICATION NUMBER

SINGLE MEMBER EIN OR SSN

---

● Name

● Grantor is a(n): ☐ individual  ☐ partnership      ☐ corporation   (check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other_____

Telephone Number

● Permanent mailing address *after* transfer (number and street)

● City and State                                     Zip Code

● Single member's name if grantor is a single member LLC

SOCIAL SECURITY NUMBER

OR

EMPLOYER IDENTIFICATION NUMBER

SINGLE MEMBER EIN OR SSN

## GRANTEE(S)

● Name

● Grantee is a(n): ☐ individual  ☐ partnership      ☐ corporation   (check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other_____

Telephone Number

● Permanent mailing address *after* transfer (number and street)

● City and State                                     Zip Code

● Single member's name if grantee is a single member LLC

SOCIAL SECURITY NUMBER

OR

EMPLOYER IDENTIFICATION NUMBER

SINGLE MEMBER EIN OR SSN

---

● Name

● Grantee is a(n): ☐ individual  ☐ partnership      ☐ corporation   (check one)  ☐ single member LLC  ☐ multiple member LLC  ☐ other_____

Telephone Number

● Permanent mailing address *after* transfer (number and street)

● City and State                                     Zip Code

● Single member's name if grantee is a single member LLC

SOCIAL SECURITY NUMBER

OR

EMPLOYER IDENTIFICATION NUMBER

SINGLE MEMBER EIN OR SSN

Form NYC-RPT                                                                                          Page 4

## GRANTOR'S ATTORNEY ▼

Name of Attorney                                                                    Telephone Number
                                                                                    (          )

Address (number and street)                                     City and State                    Zip Code

EMPLOYER
IDENTIFICATION          ☐ - ☐                OR        SOCIAL
NUMBER                                                 SECURITY            ☐ - ☐ - ☐
                                                       NUMBER

## GRANTEE'S ATTORNEY ▼

Name of Attorney                                                                    Telephone Number
                                                                                    (          )

Address (number and street)                                     City and State                    Zip Code

EMPLOYER
IDENTIFICATION          ☐ - ☐                OR        SOCIAL
NUMBER                                                 SECURITY            ☐ - ☐ - ☐
                                                       NUMBER

## CERTIFICATION ▼

I swear or affirm that this return, including any accompanying schedules, affidavits and attachments, has been examined by me and is, to the best of my knowledge, a true and complete return made in good faith, pursuant to Title 11, Chapter 21 of the Administrative Code and the regulations issued thereunder.

### GRANTOR

S worn to and subscribed to

before me on this _____ day

of _____, _____.

_____
Signature of Notary

EMPLOYER IDENTIFICATION NUMBER OR
SOCIAL SECURITY NUMBER

_____
Name of Grantor

_____
Signature of Grantor

Notary's
stamp
or seal

### GRANTEE

S worn to and subscribed to

before me on this _____ day

of _____, _____.

_____
Signature of Notary

EMPLOYER IDENTIFICATION NUMBER OR
SOCIAL SECURITY NUMBER

_____
Name of Grantee

_____
Signature of Grantee

Notary's
stamp
or seal

4

Form NYC- RPT                                                                                          ATTACHMENT

# CERTIFICATION

I swear or affirm that this return, including any accompanying schedules, affidavits and attachments, has been examined by me and is, to the best of my knowledge, a true and complete return made in good faith, pursuant to Title 11, Chapter 21 of the Administrative Code and the regulations issued thereunder.

## GRANTORS

TARA GORDON LIPTON

| EIN/SSN | Name of Grantor | Signature of Grantor |
| --- | --- | --- |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |
| EIN/SSN | Name of Grantor | Signature of Grantor |

## GRANTEES

| EIN/SSN | Name of Grantee | Signature of Grantee |
| --- | --- | --- |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |
| EIN/SSN | Name of Grantee | Signature of Grantee |

Form NYC-RPT                                                                                                                    Page 12

**SCHEDULE R - REAL ESTATE INVESTMENT TRUST TRANSFERS** - WORKSHEET FOR CONDITIONS 1(a) and 1(b)

1. *Add* lines 1, 2, 7, 8, 9 and 10 from Form NYC-RPT, Schedule 1 and enter total here.........................................................**1.** $ 100,000.00

2 a. *Enter* total number of REIT shares received ...................................................................**a.** 0

   b. *Enter* maximum number of REIT shares into which ownership interests may be converted ..........**b.** 0

   c. *Add* lines a and b...........................................................................................................**c.** 0

   d. *Enter* offering price per share of REIT shares on the date of the transaction reported.................**d.** 0.00

   e. *Multiply* line 2c by line 2d ..............................................................................................**e.** 0.00

   f. *Enter* value of ownership interests received not convertible into REIT shares ..............................**f.** 0.00

   g. *Add* lines e and f ............................................................................................................**2g.**                 0.00

3. *Multiply* line 1 by .40 for condition 1(a) or .50 for condition 1(b) ......................................................**3.** _____

● If line 3 is greater than line 2g, the transaction does not qualify as a REIT transfer.  DO NOT FILE THIS SCHEDULE.  You must file Form NYC-RPT and compute your tax due on Schedule 2.

● If line 3 is less than or equal to line 2g, the transaction will qualify as a REIT Transfer, provided the other conditions are met.  You should complete Form NYC-RPT substituting on line 4 of Schedule 2:
   - *.5%*  instead of 1%;
   - *.7125%*  instead of 1.425%;
   - *1.3125%*  instead of 2.625%

**Instructions for Completing Worksheet**    **12**

**LINE 1**

Where the value of the underlying property transferred or interest therein is used in determining the consideration for a REIT Transfer, you may, but are not required to, report as the value of the real property or interest therein (Form NYC-RPT, Schedule 1, line 7), the estimated market value as determined by the Department of Finance as reflected on the most recent Notice of Assessment issued by the Department. *(See Statements of Audit Procedure 93-2-GCT/RPTT, 3/1/93 and 95-1-GCT/RPTT, 7/28/95)* Add to the amount reported on line 1 the amount of any mortgages and other liens and encumbrances created in contemplation of the formation of the REIT in the case of condition 1(a) or in contemplation of the transaction reported on this Schedule R in the case of condition 1(b).

**LINE 2**

If the grantor received REIT shares as consideration for the transfer, enter on line 2a the number of REIT shares received.  If

the grantor received interests in a partnership or corporation controlled by the REIT that may be converted into REIT shares, enter on line 2b the maximum number of REIT shares into which such interests may be converted and attach an explanation of the terms of the conversion.  If the grantor received interests that may be converted into REIT shares but you believe that the offering price for the REIT shares into which such interests may be converted is not a proper measurement of the value of the interests received, do not complete line 2b.  Instead, attach an explanation of the terms of the conversion and enter on line 2f the fair market value of the interests received.  If the grantor received interests in a partnership or corporation controlled by the REIT that cannot be converted into REIT shares at any time, enter on line 2f the fair market value of the interests received.  If you enter an amount on line 2f, attach an explanation of the method used for determining the value of the interests received.

**CERTIFICATION**

I swear or affirm under penalties of perjury that the grantor has no present intention to transfer or convey the REIT shares or interests in a partnership or corporation controlled by the REIT received by the grantor as consideration in the transaction reported on this Schedule R within two years of the date of the transfer, other than a distribution of such shares or interests to the partners or shareholders of the grantor, and that, to the best of my knowledge, condition 3 above regarding the use of the cash proceeds of the REIT offering will be satisfied, if applicable.  I further swear or affirm  that I will file an amended Form NYC-RPT and pay any additional tax due if any such transfer or conveyance occurs within such two-year period or if condition 3 above, if applicable, ceases to be met.

**GRANTOR**                                                                          **GRANTEE**

Sworn to and subscribed to                THE BANKRUPTCY ESTATE          Sworn to and subscribed to              TARA GORDON LIPTON
                                            OF HUNTER LIPTON
before me on this _____ day                                           before me on this _____ day
                                            Name of Grantor                                                         Name of Grantee
of _____, _____                                            of _____, _____

_____          _____          _____          _____
Signature of Notary                        Signature of Grantor                       Signature of Notary                        Signature of Grantee

Notary's stamp or seal                                                     Notary's stamp or seal

2020032400151101

Form NYC- RPT                                                                                                    ATTACHMENT

# CERTIFICATION

I swear or affirm under penalties of perjury that the grantor has no present intention to transfer or convey the REIT shares or interests in a partnership or corporation controlled by the REIT received by the grantor as consideration in the transaction reported on this Schedule R within two years of the date of the transfer, other than a distribution of such shares or interests to the partners or shareholders of the grantor, and that, to the best of my knowledge, condition 3 above regarding the use of the cash proceeds of the REIT offering will be satisfied, if applicable.  I further swear or affirm  that I will file an amended Form NYC-RPT and pay any additional tax due if any such transfer or conveyance occurs within such two-year period or if condition 3 above, if applicable, ceases to be met.

## GRANTORS                                                      ## GRANTEES

TARA GORDON LIPTON

| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
|---|---|---|---|
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |
| Name of Grantor | Signature of Grantor | Name of Grantee | Signature of Grantee |

2020032400151101

| FOR CITY USE ONLY | | | | | REAL PROPERTY TRANSFER REPORT |
|---|---|---|---|---|---|
| **C1. County Code** | | **C2. Date Deed Recorded** | | | STATE OF NEW YORK |
| | | | Month   Day   Year | | STATE BOARD OF REAL PROPERTY SERVICES |
| **C3. Book OR** | | **C4. Page** | | | **RP - 5217NYC** |
| **C5. CRFN** | | | | | |

## PROPERTY INFORMATION

**1. Property Location**   255   EAST 74TH STREET 3A          MANHATTAN          10021
STREET NUMBER          STREET NAME                          BOROUGH          ZIP CODE

**2. Buyer Name**   LIPTON                          TARA GORDON
LAST NAME / COMPANY                          FIRST NAME

LAST NAME / COMPANY                          FIRST NAME

**3. Tax Billing Address**   Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY                          FIRST NAME

STREET NUMBER AND STREET NAME          CITY OR TOWN          STATE   ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed**   1   # of Parcels   OR   ☐ Part of a Parcel

**4A.** Planning Board Approval - N/A for NYC
**4B.** Agricultural District Notice - N/A for NYC

**5. Deed Property Size**   ___ FRONT FEET   X   ___ DEPTH   OR   ___ • ___ ACRES

Check the boxes below as they apply:
**6.** Ownership Type is Condominium   ☑
**7.** New Construction on Vacant Land   ☐

**8. Seller Name**   THE BANKRUPTCY ESTATE OF HUNTER LIPTON
LAST NAME / COMPANY                          FIRST NAME

GORDON LIPTON                          TARA
LAST NAME / COMPANY                          FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

| A ☑ One Family Residential | C ☐ Residential Vacant Land | E ☐ Commercial | G ☐ Entertainment / Amusement | I ☐ Industrial |
|---|---|---|---|---|
| B ☐ 2 or 3 Family Residential | D ☐ Non-Residential Vacant Land | F ☐ Apartment | H ☐ Community Service | J ☐ Public Service |

## SALE INFORMATION

**14. Check one or more of these conditions as applicable to transfer:**

**10. Sale Contract Date**   3 / 24 / 2020
Month   Day   Year

**11. Date of Sale / Transfer**   4 / 3 / 2020
Month   Day   Year

**12. Full Sale Price** $   1 , 0 0 0 , 0 0

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.)   *Please round to the nearest whole dollar amount.*

**13. Indicate the value of personal property included in the sale**

| A | ☐ Sale Between Relatives or Former Relatives |
|---|---|
| B | ☐ Sale Between Related Companies or Partners in Business |
| C | ☑ One of the Buyers is also a Seller |
| D | ☐ Buyer or Seller is Government Agency or Lending Institution |
| E | ☐ Deed Type **not** Warranty or Bargain and Sale (Specify Below) |
| F | ☐ Sale of Fractional or Less than Fee Interest ( Specify Below ) |
| G | ☐ Significant Change in Property Between Taxable Status and Sale Dates |
| H | ☐ Sale of Business is Included in Sale Price |
| I | ☐ Other Unusual Factors Affecting Sale Price ( Specify Below ) |
| J | ☐ None |

## ASSESSMENT INFORMATION  -  Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class**   R , 4      **16. Total Assessed Value** (of all parcels in transfer)   6 8 1 9 0 3

**17. Borough, Block and Lot / Roll Identifier(s)** ( If more than three, attach sheet with additional identifier(s) )

MANHATTAN  1429  1104



**CERTIFICATION** I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

**BUYER**                    **BUYER'S ATTORNEY**

BUYER SIGNATURE            DATE          LAST NAME                FIRST NAME

255 E. 74TH STREET, UNIT 3A

STREET NUMBER    STREET NAME (AFTER SALE)      AREA CODE      TELEPHONE NUMBER

**SELLER**

NEW YORK        NY        10021

CITY OR TOWN    STATE    ZIP CODE    SELLER SIGNATURE              DATE

2020032400151201

Form RP-5217 NYC                                                                                                ATTACHMENT

# CERTIFICATION

I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

## BUYERS                                                              ## SELLERS

| Buyer Signature | Date | Seller Signature | Date |
|---|---|---|---|
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |
| Buyer Signature | Date | Seller Signature | Date |

2020032400151201



Department of Taxation and Finance

**TP-584-NYC** (9/19)

*Recording office time stamp*

# Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax for the Conveyance of Real Property Located in New York City

*See Form TP-584-NYC-I, Instructions for Form TP-584-NYC, before completing this form. Print or type.*

## Schedule A – Information relating to conveyance

| Grantor/Transferor | Name *(if individual, last, first, middle initial)* (☑ mark an **X** if more than one grantor) | Social Security number (SSN) |
|---|---|---|
| ☐ Individual | THE BANKRUPTCY ESTATE OF HUNTER LIPTON | |
| ☐ Corporation | Mailing address  510 SOUTH 8TH STREET | SSN |
| ☐ Partnership | | |
| ☑ Estate/Trust | City            State            ZIP code | Employer identification number (EIN) |
| ☐ Single member LLC | LAS VEGAS        NV        89101 | ■ ■ |
| ☐ Multi-member LLC | Single member's name if grantor is a single member LLC *(see instructions)* | Single member EIN or SSN |
| ☐ Other | | |

| Grantee/Transferee | Name *(if individual, last, first, middle initial)* (☐ mark an **X** if more than one grantee) | SSN |
|---|---|---|
| ☑ Individual | LIPTON, TARA GORDON | ■ ■ ■ |
| ☐ Corporation | Mailing address 255 E. 74TH STREET, UNIT 3A | SSN |
| ☐ Partnership | | |
| ☐ Estate/Trust | City            State            ZIP code | EIN |
| ☐ Single member LLC | NEW YORK        NY        10021 | |
| ☐ Multi-member LLC | Single member's name if grantee is a single member LLC *(see instructions)* | Single member EIN or SSN |
| ☐ Other | | |

### Location and description of property conveyed

| Tax map designation – Section, block & lot *(include dots and dashes)* | SWIS code (six digits) | Street address | City, town, or village | County |
|---|---|---|---|---|
| 1 - 1429 - 1104 | 650000 | 255 EAST 74TH STREET  Unit 3A | NEW YORK | MANHATTAN / NEW YORK |

### Type of property conveyed *(mark an **X** in applicable box)*

1 ☐ One- to three-family house
2 ☐ Residential cooperative
3 ☑ Residential condominium
4 ☐ Vacant land
5 ☐ Commercial/Industrial

6 ☐ Apartment building
7 ☐ Office building
8 ☐ Four-family dwelling
9 ☐ Other _____

Date of conveyance

| 4 | 3 | 2020 |
|---|---|---|
| month | day | year |

☐ Contract executed on or before April 1, 2019 *(see instructions)*

Percentage of real property conveyed which is residential real property _____100_____ %
*(see instructions)*

### Condition of conveyance *(mark all that apply)*

a. ☑ Conveyance of fee interest

b. ☐ Acquisition of a controlling interest (state percentage acquired _____%)

c. ☐ Transfer of a controlling interest (state percentage transferred _____%)

d. ☐ Conveyance to cooperative housing corporation

e. ☐ Conveyance pursuant to or in lieu of foreclosure or enforcement of security interest *(attach Form TP-584.1, Schedule E)*

f. ☐ Conveyance which consists of a mere change of identity or form of ownership or organization *(attach Form TP-584.1, Schedule F)*

g. ☐ Conveyance for which credit for tax previously paid will be claimed *(attach Form TP-584.1, Schedule G)*

h. ☐ Conveyance of cooperative apartment(s)

i. ☐ Syndication

j. ☐ Conveyance of air rights or development rights

k. ☐ Contract assignment

l. ☐ Option assignment or surrender

m. ☐ Leasehold assignment or surrender

n. ☐ Leasehold grant

o. ☐ Conveyance of an easement

p. ☐ Conveyance for which exemption from transfer tax claimed *(complete Schedule B, Part 4)*

q. ☐ Conveyance of property partly within and partly outside the state

r. ☐ Conveyance pursuant to divorce or separation

s. ☐ Other *(describe)* _____

| For recording officer's use | Amount received | Date received | Transaction number |
|---|---|---|---|
| | Schedule B, Part 1  $ | | |
| | Schedule B, Part 2  $ | | |
| | Schedule B, Part 3  $ | | |

202003240015130102

## Schedule B – Real estate transfer tax return (Tax Law, Article 31)

**Part 1** – Computation of tax due *(in addition to the tax on line 4, you must compute the tax on lines 5a and 5b, if applicable)*

| | | | |
|---|---|---|---|
| 1 | Enter amount of consideration for the conveyance *(if you are claiming a total exemption from tax, mark the* *exemption claimed box, enter consideration and proceed to Part 4)* ................................. ☐ **Exemption claimed** | **1.** | 100,000 00 |
| 2 | Continuing lien deduction *(see instructions if property is taken subject to mortgage or lien)* ......................................... | **2.** | 0 00 |
| 3 | Taxable consideration *(subtract line 2 from line 1)* ......................................... | **3.** | 100,000 00 |
| 4 | Tax: $2 for each $500, or fractional part thereof, of consideration on line 3 ......................................... | **4.** | 400 00 |
| 5a | Tax: $1.25 for each $500, or fractional part thereof, of consideration for the conveyance of residential real property located in New York City if the amount on line 3 is $3 million or more *(see instructions)* .................... | **5a.** | 0 00 |
| 5b | Tax: $1.25 for each $500, or fractional part thereof, of consideration for the conveyance of property located in New York City other than residential real property, if the amount on line 1 is $2 million or more *(see instructions)* | **5b.** | 0 00 |
| 6 | Total before credit(s) claimed *(add lines 4, 5a, and 5b)* ......................................... | **6.** | 400 00 |
| 7 | Amount of credit claimed for tax previously paid *(see instructions and attach Form TP-584.1, Schedule G)* ............... | **7.** | 0 00 |
| 8 | Total tax due* *(subtract line 7 from line 6)* ......................................... | **8.** | 400 00 |

**Part 2** – Computation of additional tax due on the conveyance of residential real property for $1 million or more *(see instructions)*

| | | | |
|---|---|---|---|
| 1 | Enter amount of consideration for conveyance *(from Part 1, line 1)* ......................................... | **1.** | 100,000 00 |
| 2 | Taxable consideration *(multiply line 1 by the percentage of the premises which is residential real property, as shown in Schedule A)* ... | **2.** | 100,000 00 |
| 3 | Total additional transfer tax due* *(multiply line 2 by 1% (.01))* ......................................... | **3.** | 0 00 |

**Part 3** – Computation of supplemental tax due on the conveyance of residential real property, or interest therein, located in New York City, for $2 million or more

| | | | |
|---|---|---|---|
| 1 | Enter amount of consideration for conveyance *(from Part 1, line 1)* ......................................... | **1.** | 100,000 00 |
| 2 | Taxable consideration *(multiply line 1 by the percentage of the premises which is residential real property, as shown in Schedule A)* ... | **2.** | 100,000 00 |
| 3 | Total supplemental transfer tax due* *(multiply line 2 by tax rate, see instruction for rates)* ......................................... | **3.** | 0 00 |

**\* The total tax (from Part 1, line 8; Part 2, line 3; and Part 3, line 3 above) is due within 15 days from the date of conveyance.**

**Part 4** – Explanation of exemption claimed on Part 1, line 1 *(mark any boxes that apply)*

The conveyance of real property is exempt from the real estate transfer tax for the following reason:

a. Conveyance is to the United Nations, the United States of America, New York State, or any of their instrumentalities, agencies, or political subdivisions (or any public corporation, including a public corporation created pursuant to agreement or compact with another state or Canada)............................................................................................................... a ☐

b. Conveyance is to secure a debt or other obligation................................................................................................ b ☐

c. Conveyance is without additional consideration to confirm, correct, modify, or supplement a prior conveyance............... c ☐

d. Conveyance of real property is without consideration and not in connection with a sale, including conveyances conveying realty as bona fide gifts................................................................................................................................ d ☐

e. Conveyance is given in connection with a tax sale.............................................................................................. e ☐

f. Conveyance is a mere change of identity or form of ownership or organization where there is no change in beneficial ownership. (This exemption cannot be claimed for a conveyance to a cooperative housing corporation of real property comprising the cooperative dwelling or dwellings.) Attach Form TP-584.1, Schedule F ........................................... f ☐

g. Conveyance consists of deed of partition......................................................................................................... g ☐

h. Conveyance is given pursuant to the federal Bankruptcy Act................................................................................ h ☐

i. Conveyance consists of the execution of a contract to sell real property, without the use or occupancy of such property, or the granting of an option to purchase real property, without the use or occupancy of such property..................................... i ☐

j. Conveyance of an option or contract to purchase real property with the use or occupancy of such property where the consideration is less than $200,000 and such property was used solely by the grantor as the grantor's personal residence and consists of a one-, two-, or three-family house, an individual residential condominium unit, or the sale of stock in a cooperative housing corporation in connection with the grant or transfer of a proprietary leasehold covering an individual residential cooperative apartment........................................................................................................... j ☐

k. Conveyance is not a conveyance within the meaning of Tax Law, Article 31, § 1401(e) *(attach documents supporting such claim)* ......................................................................................................................... k ☐

## Schedule C – Credit Line Mortgage Certificate (Tax Law, Article 11)

**Complete the following only if the interest being transferred is a fee simple interest.**
I (we) certify that: *(mark an **X** in the appropriate box)*

1. ☑ The real property being sold or transferred is not subject to an outstanding credit line mortgage.

2. ☐ The real property being sold or transferred is subject to an outstanding credit line mortgage. However, an exemption from the tax is claimed for the following reason:

   a ☐ The transfer of real property is a transfer of a fee simple interest to a person or persons who held a fee simple interest in the real property (whether as a joint tenant, a tenant in common or otherwise) immediately before the transfer.

   b ☐ The transfer of real property is (A) to a person or persons related by blood, marriage or adoption to the original obligor or to one or more of the original obligors or (B) to a person or entity where 50% or more of the beneficial interest in such real property after the transfer is held by the transferor or such related person or persons (as in the case of a transfer to a trustee for the benefit of a minor or the transfer to a trust for the benefit of the transferor).

   c ☐ The transfer of real property is a transfer to a trustee in bankruptcy, a receiver, assignee, or other officer of a court.

   d ☐ The maximum principal amount secured by the credit line mortgage is $3,000,000 or more, and the real property being sold or transferred is **not** principally improved nor will it be improved by a one- to six-family owner-occupied residence or dwelling.

   **Note:** for purposes of determining whether the maximum principal amount secured is $3,000,000 or more as described above, the amounts secured by two or more credit line mortgages may be aggregated under certain circumstances. See TSB-M-96(6)-R for more information regarding these aggregation requirements.

   e ☐ Other *(attach detailed explanation)*.

3. ☐ The real property being transferred is presently subject to an outstanding credit line mortgage. However, no tax is due for the following reason:

   a ☐ A certificate of discharge of the credit line mortgage is being offered at the time of recording the deed.

   b ☐ A check has been drawn payable for transmission to the credit line mortgagee or his agent for the balance due, and a satisfaction of such mortgage will be recorded as soon as it is available.

4. ☐ The real property being transferred is subject to an outstanding credit line mortgage recorded in _____ (insert liber and page or reel or other identification of the mortgage). The maximum principal amount of debt or obligation secured by the mortgage is _____. No exemption from tax is claimed and the tax of _____ is being paid herewith. *(Make check payable to county clerk where deed will be recorded or, if the recording is to take place in New York City but not in Richmond County, make check payable to the **NYC Department of Finance**.)*

## Signature (both the grantor(s) and grantee(s) must sign)

The undersigned certify that the above information contained in schedules A, B, and C, including any return, certification, schedule, or attachment, is to the best of his/her knowledge, true and complete, and authorize the person(s) submitting such form on their behalf to receive a copy for purposes of recording the deed or other instrument effecting the conveyance.

_____     _____     _____     _____
Grantor signature     Title     Grantee signature     Title

_____     _____     _____     _____
Grantor signature     Title     Grantee signature     Title

**Reminder:** Did you complete all of the required information in Schedules A, B, and C? Are you required to complete Schedule D? If you marked *e*, *f*, or *g* in Schedule A, did you complete Form TP-584.1? If the contract was executed prior to April 1, 2019, did you attach the necessary verification? Have you attached your check(s) made payable to the county clerk where recording will take place or, if the recording is in the New York City boroughs of Manhattan, Bronx, Brooklyn, or Queens, to the **NYC Department of Finance**? If no recording is required, send this return and your check(s), made payable to the **NYS Department of Taxation and Finance**, directly to the NYS Tax Department, RETT Return Processing, PO Box 5045, Albany NY 12205-0045. If not using U.S. Mail, see Publication 55, *Designated Private Delivery Services*.

**Signature (both the grantor(s) and grantee(s) must sign)**

The undersigned certify that the above information contained in schedules A, B, and C, including any return, certification, schedule, or attachment, is to the best of his/her knowledge, true and complete, and authorize the person(s) submitting such form on their behalf to receive a copy for purposes of recording the deed or other instrument effecting the conveyance.

| | | | |
|---|---|---|---|
| Grantor signature | Title | Grantee signature | Title |
| Grantor signature | Title | Grantee signature | Title |

2020032400151301

## Schedule D – Certification of exemption from the payment of estimated personal income tax (Tax Law, Article 22, § 663)

**Complete the following only if a fee simple interest or a cooperative unit is being transferred by an individual or estate or trust.**

**If the property is being conveyed by a referee pursuant to a foreclosure proceeding, proceed to Part 2, mark the second box under *Exemptions for nonresident transferor(s)/seller(s)*, and sign at bottom.**

**Part 1 –** New York State residents

If you are a New York State resident transferor/seller(s) listed in Form TP-584-NYC, Schedule A (or an attachment to Form TP-584-NYC), you must sign the certification below. If one or more transferors/sellers of the real property or cooperative unit is a resident of New York State, **each** resident transferor/seller must sign in the space provided. If more space is needed, photocopy this Schedule D and submit as many schedules as necessary to accommodate all resident transferors/sellers.

### Certification of resident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property or cooperative unit, the transferor(s)/seller(s) as signed below was a resident of New York State, and therefore is not required to pay estimated personal income tax under Tax Law, § 663(a) upon the sale or transfer of this real property or cooperative unit.

| Signature | Print full name | Date |
|-----------|-----------------|------|
| Signature | Print full name | Date |
| Signature | Print full name | Date |
| Signature | Print full name | Date |

**Note:** A resident of New York State may still be required to pay estimated tax under Tax Law, § 685(c), but not as a condition of recording a deed.

**Part 2 –** Nonresidents of New York State

If you are a nonresident of New York State listed as a transferor/seller in Form TP-584-NYC, Schedule A (or an attachment to Form TP-584-NYC) but are not required to pay estimated personal income tax because one of the exemptions below applies under Tax Law, § 663(c), mark the box of the appropriate exemption below. If any one of the exemptions below applies to the transferor(s)/seller(s), that transferor(s)/seller(s) is not required to pay estimated personal income tax to New York State under Tax Law, § 663. **Each** nonresident transferor/seller who qualifies under one of the exemptions below must sign in the space provided. If more space is needed, photocopy this Schedule D and submit as many schedules as necessary to accommodate all nonresident transferors/sellers.

If none of these exemption statements apply, you must complete Form IT-2663, *Nonresident Real Property Estimated Income Tax Payment Form*, or Form IT-2664, *Nonresident Cooperative Unit Estimated Income Tax Payment Form.* For more information, see *Payment of estimated personal income tax,* on Form TP-584-NYC-I, page 1.

### Exemption for nonresident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property or cooperative unit, the transferor(s)/seller(s) (grantor) of this real property or cooperative unit was a nonresident of New York State, but is not required to pay estimated personal income tax under Tax Law, § 663 due to one of the following exemptions:

☐ The real property or cooperative unit being sold or transferred qualifies in total as the transferor's/seller's principal residence (within the meaning of Internal Revenue Code, section 121) from _____ to _____ *(see instructions)*.
Date             Date

☐ The transferor/seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure, or in lieu of foreclosure with no additional consideration.

☐ The transferor or transferee is an agency or authority of the United States of America, an agency or authority of the state of New York, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

| Signature | Print full name | Date |
|-----------|-----------------|------|
| Signature | Print full name | Date |
| Signature | Print full name | Date |
| Signature | Print full name | Date |

2020032400151301

## Certification of resident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property or cooperative unit, the transferor(s)/seller(s) as signed below was a resident of New York State, and therefore is not required to pay estimated personal income tax under Tax Law, section 663(a) upon the sale or transfer of this real property or cooperative unit.

| Signature | Print full name | Date |
|---|---|---|
| Signature | Print full name | Date |
| Signature | Print full name | Date |
| Signature | Print full name | Date |

## Exemption for nonresident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property or cooperative unit, the transferor(s)/seller(s) (grantor) of this real property or cooperative unit was a nonresident of New York State, but is not required to pay estimated personal income tax under Tax Law, section 663 due to one of the following exemptions:

☐ The real property or cooperative unit being sold or transferred qualifies in total as the transferor's/seller's principal residence (within the meaning of Internal Revenue Code, section 121) from ⎯⎯⎯⎯⎯ to ⎯⎯⎯⎯⎯ *(see instructions)*.
Date          Date

☐ The transferor/seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure, or in lieu of foreclosure with no additional consideration.

☐ The transferor or transferee is an agency or authority of the United States of America, an agency or authority of the state of New York, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

| Signature | Print full name | Date |
|---|---|---|
| Signature | Print full name | Date |
| Signature | Print full name | Date |
| Signature | Print full name | Date |

2020032400151301

**TP-584**

## TRANSFERS INVOLVING MULTIPLE GRANTORS AND/OR GRANTEES

| NOTE | If additional space is needed, attach copies of this schedule or an addendum listing all of the information required below. |
|---|---|

**Grantor/Transferor**

- [x] Individual
- [ ] Corporation
- [ ] Partnership
- [ ] Estate/Trust
- [ ] Single member LLC
- [ ] Multi-member LLC
- [ ] Other

| Name (if individual, last, first, middle initial)   GORDON LIPTON, TARA | Social security number ███ █ ████ |
|---|---|
| Mailing address  255 E. 74TH STREET, UNIT 3A | Social security number |
| City  NEW YORK  State  NY  ZIP code  10021 | Federal EIN |
| Country | |
| Single member's name if grantor/grantee is a single member LLC | Single member EIN or SSN |

- [ ] Individual
- [ ] Corporation
- [ ] Partnership
- [ ] Estate/Trust
- [ ] Single member LLC
- [ ] Multi-member LLC
- [ ] Other

| Name (if individual, last, first, middle initial) | Social security number |
|---|---|
| Mailing address | Social security number |
| City  State  ZIP code | Federal EIN |
| Country | |
| Single member's name if grantor/grantee is a single member LLC | Single member EIN or SSN |

- [ ] Individual
- [ ] Corporation
- [ ] Partnership
- [ ] Estate/Trust
- [ ] Single member LLC
- [ ] Multi-member LLC
- [ ] Other

| Name (if individual, last, first, middle initial) | Social security number |
|---|---|
| Mailing address | Social security number |
| City  State  ZIP code | Federal EIN |
| Country | |
| Single member's name if grantor/grantee is a single member LLC | Single member EIN or SSN |

- [ ] Individual
- [ ] Corporation
- [ ] Partnership
- [ ] Estate/Trust
- [ ] Single member LLC
- [ ] Multi-member LLC
- [ ] Other

| Name (if individual, last, first, middle initial) | Social security number |
|---|---|
| Mailing address | Social security number |
| City  State  ZIP code | Federal EIN |
| Country | |
| Single member's name if grantor/grantee is a single member LLC | Single member EIN or SSN |

- [ ] Individual
- [ ] Corporation
- [ ] Partnership
- [ ] Estate/Trust
- [ ] Single member LLC
- [ ] Multi-member LLC
- [ ] Other

| Name (if individual, last, first, middle initial) | Social security number |
|---|---|
| Mailing address | Social security number |
| City  State  ZIP code | Federal EIN |
| Country | |
| Single member's name if grantor/grantee is a single member LLC | Single member EIN or SSN |

# EXHIBIT "D"

Bill of Sale (Personal   Property in NY Apt.

and Aspen Timeshare)

**BILL OF SALE**

   For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Bankruptcy Estate of HUNTER LIPTON ("Debtor"), by and through the Court appointed Chapter 7 Trustee Shelley D. Krohn ("Trustee"), in connection with Chapter 7 Bankruptcy Case pending in the United States Bankruptcy Court, District of  Nevada, as Bankruptcy Case No. BK-S-19-13898-ABL (the "Bankruptcy Estate"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to Tara Lipton (together, "Buyer"), 100% of the Estate's right, title and interest in and to any and all personal property and contents, including but not limited to, furniture, furnishings, artwork, and personalty, reposing in the New York apartment located at [E. 74th Street, New York, New York, Apartment 3A] and the Aspen Timeshare as of the Effective Date (the "Property"), including but not limited to that Property identified in **Exhibit "A"**, attached hereto and made a part hereof.

   Trustee, for herself, successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Trustee will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, her successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

   IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of April __, 2020.

        **THE BANKRUPTCY ESTATE OF HUNTER LIPTON, Nevada Bankruptcy Case No. BK-S-19-13898-ABL**

        By: _____
          Shelley D. Krohn,
          Chapter 7 Trustee for the
          Bankruptcy Estate of Hunter Lipton

# EXHIBIT A

Video clips of personal property, including, but not limited to the following:

| Living Room |
|---|
| TV |
| Sound Bar |
| Large round glass/crystal decorative |
| Glass/crystal round decoration |
| Green glass dog |
| Cowhide bench |
| 2 small cowhide pillows |
| Michael Jordan cardboard cutout |
| Orchid on coffee table (real or fake) |
| Light Blue Couch |
| Large Painting Behind Couch - Painting with balloon arches and neighborhood under construction (Living room) |
| 1 Black Living Room Chair |
| 2 Matching Crème Living Room Chairs |
| Glass Coffee Table |
| Small standing book shelf |

| Office |
|---|
| IMac |
| Apple Keyboard/ Mouse |
| Macbook |
| Ipad |
| 2 pictures above computer |
| 2 white office chairs |

| Kitchen |
|---|
| Espresso Machine |
| 2 Mid Century Modern Chairs |
| White Tea Kettle |

| Entry Way |
|---|
| Crystal Chandelier |
| Green bench |
| Green/blue pillow |

110807556.1

| Hallway/Entry of Bedroom |
|---|
| Painting Hallway – Abstract (red, green, white) |
| Painting Hallway – Picture of a Band |

| Hallway |
|---|
| Art<br>    a)  Black/red/white blocks (painting)<br>    b)  White canvas painting of woman lying in a carriage |
|  |

| Game Room |
|---|
| Art<br>    a)  Painting of shadow person with arms raised (Brown and Tan)<br>    b)  Painting of cows grazing outside<br>    c)  Painting of Man running (blue pants/red shirt) |
| TV |
| Sound bar |
| Buddha |
| Xbox 360 |
| 2 wireless Xbox 360 remotes |
| Small Gray Bench |
| White Couch |
| 2 White Stools |

| Master Bedroom |
|---|
| Bedroom Set<br>    a)  Headboard<br>    b)  Bedframe<br>    c)  Kind bed |
| Lounge Chair in bedroom (tan) |
| Wood end table |
| Multi-line telephone |
| Bedroom Art<br>    a)  Gold frame w/ picture of woman<br>    b)  2 Tiny dancing Shiva<br>    c)  White frame w/ picture of 3 men in blue suits<br>    d)  3 matching dark wood frames with pictures<br>    e)  Picture of multicolored circle |
| Smart TV |
| Sound bar |

3

| Children's Room – 1 |
| --- |
| 1 White Desk Chairs |
| 1 Black Desk Chair |
| 1 Bed |

| Children's Room – 2 |
| --- |
| 1 White Desk Chair |
| 2 White Bean Bag Chairs |

| Children's Room – 3 |
| --- |
| 1 White Desk Chair |
| 1 Bed |

| Laundry Room |
| --- |
| 1 Washing Machine |
| 1 Drying Machine |

| Miscellaneous |
| --- |
| Towels<br>Sheets, blankets, pillows<br>China<br>Vases<br>Mirror<br>Silverware<br>Plates, bowls |
| Pots/pans<br>Guitars<br>Golf clubs<br>Bikes<br>Art:<br>a)      Dive into the ocean/beach<br>b)      Blue white painting<br>c)      Black white large painting<br>d)      Young girl portrait |

4

110807556.1

# EXHIBIT "E"

## Stipulation & Order to Dismiss State Court

## Action with Prejudice

**SAO**
Lenard E. Schwartzer, Esq.
NV Bar No. 0399
Jeanette E. McPherson, Esq.
NV Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590
Facsimile:   (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com
*Attorneys for Shelley D. Krohn, Chapter 7 Bankruptcy Trustee*
*and Real Party in Interest*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| HUNTER LIPTON, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>MDF HOLDINGS, LLC, a Delaware limited liability company; HERBERT FEINBERG, individually; DOES I-X; and ROE COMPANIES XI-XX, inclusive,<br><br>　　　　Defendant. | Case No.:  A-19-794699-C<br>Dept. No.: 20<br><br><br>**STIPULATION AND ORDER TO DISMISS CASE WITH PREJUDICE** |

Defendant MDF HOLDINGS, LLC, a Delaware limited liability company; HERBERT FEINBERG, individually ("Defendants"), and Court Appointed Chapter 7 Trustee Shelley D. Krohn ("Trustee") of the Bankruptcy Estate of Plaintiff HUNTER LIPTON ("Plaintiff"), and as Trustee the real party in interest in the place of and in the stead of Plaintiff as the Chapter 7 Trustee,  (collectively, the "Parties"), all by and through counsel, hereby enter into this stipulation and order to dismiss the above-captioned case with prejudice.

## RECITALS

**WHEREAS**, on May 13, 2019, Plaintiff commenced the above-captioned pending lawsuit against MDF and Feinberg, in the Eighth Judicial District Court, Clark County, Nevada, pending as Case No. A-19-794699-C, in Department No. 20 (hereinafter the "State Court Action").

110806652.1

1    **WHEREAS**, on June 20, 2019 ("Petition Date"), Plaintiff filed a voluntary petition for

2    relief under Chapter 7 of the Bankruptcy Code, thereby commencing bankruptcy Case No. BK-

3    S-19-13898-ABL (the "Bankruptcy Case").

4    **WHEREAS**, Shelley D. Krohn is the duly appointed and acting Chapter 7 Trustee in the

5    Plaintiff's Bankruptcy Case.

6    **WHEREAS**, the Trustee, on behalf of the Plaintiff's Bankruptcy Estate, and in the place

7    and in the stead of Plaintiff, and Defendants MDF and Feinberg entered into a settlement

8    agreement which provided for, among other things, a stipulation to dismiss the above-captioned

9    State Court Action with prejudice.

10    **THEREFORE**, pursuant to the settlement reached between the Parties, the Parties hereto

11    agree and stipulate as follows:

12    **IT IS HEREBY STIPULATED** that the above-captioned action shall hereby be

13    **DISMISSED WITH PREJUDICE**.

14    **IT IS FURTHER STIPULATED** that all hearings, trial and any deadlines are hereby

15    **VACATED**.

16    **IT IS FURTHER STIPULATED** that all Parties to bear their own fees and costs, subject

17    to the terms set forth in the Settlement Agreement entered into between the Parties.

18    **IT IS FURTHER STIPULATED** that the Bankruptcy Court shall retain jurisdiction over

19    the Settlement Agreement entered into between the Parties.

20    **IT IS SO STIPULATED AND AGREED.**

21

22    DATED: April __, 2020                        DATED: April ___, 2020.

23    **SCHWARTZER & MCPHERSON LAW**        **LEWIS ROCA ROTHGERBER**
      **FIRM**                                **CHRISTIE LLP**

24
      */s/Lenard Schwartzer*                   */s/ Ogonna Brown*
25    Lenard E. Schwartzer, Esq. (NBN 0399)    Ogonna M. Brown, Esq. (NBN 7589)
                                               Adrienne Brantley-Lomeli, Esq.
26    2850 South Jones Boulevard, Suite 1      (NBN 14486)
      Las Vegas, Nevada  89146-5308            3993 Howard Hughes Parkway, Suite 600
27    E-Mail:  bkfilings@s-mlaw.com            Las Vegas, NV 89169
      *Attorneys for Shelley D. Krohn, Chapter 7*   *Attorneys for Defendants MDF Holdings, LL*
28    *Bankruptcy Trustee and Real Party in Interest*   *and Herb Feinberg*

Page 2 of 3

## ORDER

Based upon the above stipulation, and good cause appearing,

**IT IS HEREBY ORDERED** that this Stipulation is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the above-captioned case shall hereby be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all hearings, trial and any deadlines are hereby ordered **VACATED**.

**IT IS FURTHER ORDERED** that all Parties to bear their own fees and costs, subject to the terms set forth in the Settlement Agreement entered into between the Parties.

**IT IS FURTHER ORDERED** that the Bankruptcy Court shall retain jurisdiction over the Settlement Agreement entered into between the Parties.

**IT IS SO ORDERED.**

DATED this _____ day of _____, 2020

_____
DISTRICT COURT JUDGE
Case No. A- A-19-794699-C

Respectfully submitted by:
**SCHWARTZER & MCPHERSON LAW FIRM**

_____
Lenard E. Schwartzer, Esq. (NBN 0399)
Jeanette E. McPherson, Esq. (NBN 5423)
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:  (702) 228-7590 )
Facsimile:   (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com

*Attorneys for Shelley D. Krohn, Chapter 7 Bankruptcy Trustee
and Real Party in Interest*

110806652.1